**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**
**Civil Action No.: 26-cv-000243**

Fish Kiss, Inc.,

Plaintiff,

v.

Swedish Treasures, LLC d/b/a Wet-It!; Charles Justin Davies; Louise Mathilda Davies; Joanna Philippa Kidd; Zentra LLC; and Does 1–3,

Defendants.

**COMPLAINT**

Jury Trial Demanded

Plaintiff Fish Kiss, Inc. ("Fish Kiss" or "Plaintiff"), by and through its undersigned attorneys, hereby prays to this honorable Court for relief based on the following:

## INTRODUCTION

1. Anne Klein ("Klein") is a visual artist and the principal of Fish Kiss, Inc., a company that designs, markets, and sells home décor and textile products featuring an original collection of more than 50 hand-drawn illustrated maps of U.S. states and cities, each incorporating icons reflecting local history, people, landmarks, and cultural features within the geographic form (the "Fish Kiss Artwork"). Fish Kiss is the owner of 46 federally registered copyrights and the registered trademark FISH KISS® for its artwork, brand and products. Fish Kiss also occasionally licenses its artwork to third parties.

2. Defendant Swedish Treasures, LLC d/b/a Wet-It! is a former licensee that unlawfully exploited its temporary control of the Fish Kiss business and Klein's trust to misappropriate its assets, infringe its intellectual property, and divert Fish Kiss's sales and customers to its own competing business. While entrusted to operate the Fish Kiss business under two agreements from 2023 through 2026, Defendants gained access to Fish Kiss's original artwork, customer relationships, vendors, and goodwill. When that relationship ended and Klein resumed control, Defendant did not step aside—it launched a coordinated effort to appropriate the Fish Kiss business for itself.

3. Defendant hired an artist to copy the Fish Kiss Artwork, sold products bearing that infringing artwork, exploited Fish Kiss's confidential customer and vendor lists to build a competing business, misused Fish Kiss's trademarks to market competing goods, falsely publicized that the Fish Kiss product line was retiring and that its own product was "Replacing Fish Kiss," sublicensed Fish Kiss's intellectual property to a third party without authorization and caused that third party to sell Fish Kiss products through Fish Kiss's own Amazon storefront, printed competing artwork on blank towels from Fish Kiss's supply chain and sold them without required labeling, and falsely advertised those goods as made in the United States.

4. This action seeks to stop that misconduct and hold Defendants accountable for their copyright infringement, trademark infringement, breach of contract, breach of fiduciary duty, trade secret misappropriation, and unfair competition—all undertaken with deliberation and malicious intent.

## JURISDICTION AND VENUE

5. This action arises under the Copyright Act of 1976, 17 U.S.C. §§ 101 et seq., the Lanham Act, 15 U.S.C. § 1051 et seq., and North Carolina statutory and common law, including N.C. Gen. Stat. § 75-1.1, the North Carolina Trade Secrets Protection Act, N.C. Gen. Stat. § 66-152 et seq., the Textile Fiber Products Identification Act, 15 U.S.C. § 70 et seq., and related state law claims.

6. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a). This Court has supplemental jurisdiction over all state law claims pursuant to 28 U.S.C. § 1367.

7. Personal jurisdiction over Defendants is proper in this District. Defendant Swedish Treasures, LLC was formed and is operating in North Carolina. Defendants Justin and Mathilda Davies (collectively, "Defendants Davies"), the owners of Swedish Treasures, LLC, are individuals domiciled in North Carolina. Defendant Zentra, LLC was formed and is operating in North Carolina. Defendant Joanna Philippa Kidd is an individual domiciled in Rutherfordton, North Carolina. Each Defendant has purposefully availed itself of the privilege of conducting business in North Carolina by importing, displaying, distributing, and selling products—including the infringing products—in this District and directing commercial activity toward consumers in this District.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (c) because Defendants are subject to personal jurisdiction in this District and therefore reside here for venue purposes. Venue is also proper under 28 U.S.C.

§ 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, including Defendants' creation, licensing, marketing, distribution, offering for sale, and/or sale of infringing products in this District, and the resulting injury to Plaintiff.

## PARTIES

9. Plaintiff Fish Kiss, Inc. ("Fish Kiss") is a corporation organized and existing under the laws of the State of Colorado with its principal place of business in Erie, Colorado 80516.

10. Defendant Swedish Treasures, LLC d/b/a Wet-It! ("Wet-It") is a limited liability company organized and existing under the laws of North Carolina with its principal place of business in Forest City, North Carolina. Wet-It is a former licensee of the Fish Kiss Artwork that managed and operated the Fish Kiss business between 2023 and 2026, and created, manufactured, and distributed infringing products.

11. Defendant Charles Justin Davies ("Justin Davies") is a resident of Rutherford County, North Carolina. Davies is the Chief Operating Officer of Wet-It, makes most executive decisions for the Wet-It business, was chiefly responsible for Wet-It's relationship with Fish Kiss, and oversaw Fish Kiss's operations.

12. Defendant Louise Mathilda Davies ("Mathilda Davies") is a resident of Rutherford County, North Carolina. Mathilda Davies is the Chief Executive Officer of Wet-It and is responsible for design and product development. Mathilda Davies is the sister of Defendant Joanna Philippa Kidd and, together with Justin Davies, makes executive decisions for the Wet-It business.

13. Defendant Joanna Philippa Kidd ("Kidd") is a resident of Rutherford County. Kidd is the artist who created the Infringing Artwork at Wet-It's instruction. Kidd does business as "Pippa!" and is the sister of Defendant Mathilda Davies.

14. Defendant Zentra LLC ("Zentra") is a limited liability company organized and existing under the laws of North Carolina with a principal place of business in Indian Trail, North Carolina. Wet-It purported to sublicense Fish Kiss's intellectual property rights to Zentra in violation of the express terms of both license agreements. Zentra, acting on that void sublicense, purchased and distributed products bearing the Fish Kiss Artwork, sold those products on Wet-It's Amazon storefront and on Fish Kiss's own Amazon branded storefront without authorization, and used the FISH KISS mark in commerce.

15. Upon information and belief, Doe Defendants 1–3, inclusive, are currently unidentifiable vendors and distributors of the Infringing Products, each of which Doe Defendants 1–3 is in some manner responsible for the acts, omissions, and damages alleged herein, including by facilitating, participating in, or benefiting from the unauthorized distribution of products bearing the Fish Kiss Artwork and/or the FISH KISS Mark through channels other than those presently known to Plaintiff, and/or by facilitating, brokering, or participating in the unauthorized arrangement between Wet-It and Zentra. The true names, whether corporate, individual, or otherwise, of Doe Defendants 1–3 are presently unknown to Plaintiff, who therefore sues said Doe Defendants by such fictitious names and will seek leave to amend this complaint to show their true names and capacities when ascertained.

16. Upon information and belief, Doe Defendants 4–8, inclusive, are currently unidentifiable retailers and/or vendors of the Infringing Products, which Doe Defendants 4–8 have displayed and distributed without Plaintiff's consent, or have contributed to said infringement. The true names of the Doe Defendants 4–8 are presently unknown to Plaintiff, who therefore sues said Doe Defendants by such fictitious names and will seek leave to amend this complaint to show their true names and capacities when ascertained.

17. Upon information and belief, at all relevant times, each Defendant was the agent, affiliate, officer, director, manager, principal, shareholder, member, alter ego, employee, and/or co-conspirator of each of the other Defendants and was acting within the scope of such relationship.

18. Upon information and belief, Defendants—and each of them—actively participated in, controlled, ratified, or otherwise adopted the infringing and unlawful conduct of the others, with knowledge of the wrongful nature of such conduct and the resulting harm to Plaintiff.

## FACTUAL BACKGROUND

### I. THE FISH KISS ARTWORK AND BUSINESS

19. Anne Klein is a visual artist and the principal of Fish Kiss. Fish Kiss designs, markets, and sells home décor and textile products featuring an original collection of more than 50 hand-drawn illustrated maps of U.S. states and cities, each incorporating icons reflecting local history, people, landmarks, and cultural features

within the geographic form (the "Fish Kiss Artwork"). Fish Kiss licenses the Fish Kiss Artwork to third parties for use on a range of home goods and giftware.

20. Klein started the Fish Kiss business in 2014. Klein spent over two years researching the geography, history, culture, landmarks, local foods, notable people, and obscure references for each state before creating the original Fish Kiss Artwork, dedicating significant time, effort, and resources to that creative portfolio of work. The Fish Kiss Artwork is distinctive and commercially valuable. An exemplar image is shown below:




21. Fish Kiss is the owner of 46 federally registered copyrights for the Fish Kiss Artwork depicting each of the United States except Alaska, North Dakota, South

Dakota, and Rhode Island. Fish Kiss acquired these copyright registrations by written assignment from Fish Kiss, LLC, effective April 1, 2021. Fish Kiss is also the owner of U.S. Trademark Registration No. 5,027,160 for the FISH KISS and Design mark, registered in International Class 24 for "*tea towels*," and U.S. Trademark Registration No. 5,122,913 for the FISH KISS and Design mark, registered in International Class 21 for dinnerware and drinkware, generally. True copies of the registration certificates for Fish Kiss's 46 copyrights, the written assignment transferring those copyright registrations to Fish Kiss, and the certificates for Fish Kiss's two trademark registrations are attached as **Exhibit A**. All copyright registrations are valid, subsisting, and owned exclusively by Fish Kiss.

## II. THE PARTIES' LICENSE AGREEMENTS

### The 2023 License and Collaboration Agreement

22. In 2022, Klein realized she needed help managing and operating the Fish Kiss business so she could raise her family. Klein had her first child in 2022 and soon thereafter discovered she was pregnant with twins in 2023.

23. Klein sought a trustworthy business manager to run the day-to-day operations of Fish Kiss, including marketing the brand; taking and fulfilling orders; maintaining and nurturing existing customer relationships and establishing new ones; and managing Fish Kiss's vendors for the creation and manufacturing of Fish Kiss products.

24. Klein was introduced to Justin Davies and Mathilda Davies ("the Davieses") via email by Tory Johnson of Good Morning America in 2019. Tory

Johnson expressed interest in featuring the Fish Kiss Artwork on Wet-It's primary product, Swedish dishcloths, for a Good Morning America product showcase. Klein subsequently met the Davieses in person at a tradeshow.

25. When the Davieses expressed interest in collaborating with Fish Kiss beyond the Good Morning America deal, Klein told the Davieses that she was wary of licensing arrangements because of a very negative experience with a previous licensee.

26. In 2021, Klein licensed the Fish Kiss Artwork to Wet-It for use on Swedish dishcloths to be sold through a Good Morning America product feature. In 2022, Justin Davies suggested that Klein license the Fish Kiss Artwork to Wet-It for production of all Fish Kiss products moving forward, considering her intention to raise a family.

27. Despite her trepidation, Fish Kiss accepted Justin Davies's offer and, on May 23, 2023, Fish Kiss and Wet-It entered into a License and Collaboration Agreement (the "2023 Agreement"), a true and correct copy of which is attached hereto as **Exhibit B** and incorporated herein by reference. The 2023 Agreement had an effective date of January 1, 2023, and an expiration date of January 1, 2025.

28. Under the 2023 Agreement, Wet-It received a limited, revocable, non-transferable, and non-sublicensable license to use the Fish Kiss Artwork solely in connection with the manufacture, promotion, sale, and distribution of tea towels, drinkware, plateware, and Swedish dishcloths (the "Licensed Products"). Fish Kiss expressly reserved all rights not expressly granted.

29. In addition to the license, and as a central element of the parties' arrangement, Wet-It was entrusted to assume full day-to-day operational management of the Fish Kiss business on Fish Kiss's behalf. Wet-It assumed responsibility for sourcing, production, order fulfillment, sales, accounting, marketing, growing and nurturing customer relationships, vendor communications and relationships, operating and managing software systems, marketplace platforms, social media, and the Fish Kiss website.

30. This delegation granted Wet-It the broadest operational control and discretionary management of the Fish Kiss business—going far beyond a typical licensee role. Klein provided Wet-It with "the keys to the castle," granting it full access to Fish Kiss's proprietary artwork files, software platforms, customer lists, vendor lists, and sensitive and confidential business information.

31. The parties' relationship at the outset of the 2023 Agreement was cooperative, and Wet-It generally operated the Fish Kiss business in compliance with the parties' contract.

**The 2025 License and Collaboration Agreement**

32. The 2023 Agreement expired by its terms on January 1, 2025. On May 12, 2025, Klein sent Wet-It a proposed successor license agreement (the "2025 Agreement") to govern the parties' ongoing relationship. On June 3, 2025, Justin Davies executed the 2025 Agreement.

33. The 2025 Agreement, a true and correct copy of which is attached hereto as **Exhibit C** and incorporated herein by reference, had an effective date of January

1, 2025, and an expiration date of January 1, 2026, and superseded the 2023 Agreement with respect to its subject matter.

34. Under the 2025 Agreement, Wet-It received a one-year exclusive license to use the Fish Kiss Artwork in connection with the manufacture, sale, promotion, and distribution of tea towels, glass drinkware, ceramic mugs, plastic platters, and Swedish dishcloths, and a non-exclusive license for art prints, posters, art canvases, baby clothing, pillows, and mini multi-use towels.

35. The 2025 Agreement expressly acknowledged Fish Kiss's existing license and pre-booking arrangement with Occasionally Made, LLC d/b/a Swig ("Swig"), ("Swig") for tumblers and stainless-steel drinkware, and provided that the exclusivity provisions did not restrict Fish Kiss's right to grant limited pre-production licenses to third parties. (2025 Agreement, Para. I.E.)

**Key Restrictive Provisions Common to Both Agreements**

36. Both the 2023 Agreement and the 2025 Agreement (collectively the "Wet-It Agreements") required Wet-It to pay Fish Kiss monthly royalties of eight percent (8%) of net sales of sponge cloth products and seven percent (7%) of net sales of all other Licensed Products, within thirty (30) days of the last day of each preceding month, accompanied by a certified written accounting statement showing gross invoice amounts, deductible discounts, and net sales for each Licensed Product. Royalties more than ten (10) days overdue accrued a late fee of 1.5% of the balance due per day, and all collection costs—including reasonable attorneys' fees—were to

be borne by Wet-It. (2023 Agreement, Para. VIII.A–D; 2025 Agreement, Para. VIII.A–D.)

37. Both Wet-It Agreements expressly prohibited Wet-It from granting sublicenses of the Fish Kiss Artwork and the FISH KISS mark to any third party. The license granted to Wet-It was non-transferable, non-assignable, and non-sublicensable. Any purported sublicense was null and void. (2023 Agreement, Para. I.B, XII.C; 2025 Agreement, Para. I.C, XII.A–C.)

38. Both Wet-It Agreements prohibited Wet-It from selling Licensed Products to off-price, value, discount, or job lot retailers without Fish Kiss's prior written approval, and from discounting the price of Licensed Products by more than thirty percent (30%) of regular retail price without Fish Kiss's prior written authorization. (2023 Agreement, Para. X.D; 2025 Agreement, Para. X.C.)

39. Both Wet-It Agreements prohibited Wet-It from making any misrepresentations or deceitful statements in connection with the marketing of Licensed Products, and required Wet-It to withdraw any inaccurate statement within five (5) days of notice. (2023 Agreement, Para. X.F; 2025 Agreement, Para. X.E.)

40. Both Wet-It Agreements expressly stated that Fish Kiss's customer and vendor information is "extremely valuable" confidential information, "the disclosure of which would cause irreparable damage" to Fish Kiss, and that such information was provided to Wet-It solely for the purpose of operating the Fish Kiss business. Wet-It was required to keep all confidential information strictly confidential during

the term and for three (3) years following termination, and to then destroy it. (2023 Agreement, Para. II.B.2, XV.B–C; 2025 Agreement, Para. II.B.2, XV.B–C.)

41. Both Wet-It Agreements prohibited Wet-It from creating derivative works from the Fish Kiss Artwork in any manner, and instructed that any such works would be owned exclusively by Fish Kiss. The 2025 Agreement further provided that any derivative works resulting from changes to the Licensed Artwork—material or otherwise—are owned exclusively by Fish Kiss. (2023 Agreement, Para. XI.D; 2025 Agreement, Para. VI.B, XI.D.)

42. Both Wet-It Agreements required Wet-It to provide Fish Kiss with a complete written inventory accounting within ten (10) days of termination. Upon termination, Fish Kiss had the right to purchase remaining inventory at the lowest wholesale price, or to direct that it be destroyed or donated to a charitable organization approved by Fish Kiss in writing. The 2025 Agreement contained no sell-off period. (2023 Agreement, Para. V.B–C; 2025 Agreement, Para. V.B–D.)

43. Upon expiration of the 2025 Agreement, Wet-It was required to immediately destroy all digital images, sketches, derivative works, and production materials for the Licensed Artwork and to certify that destruction to Fish Kiss. Both agreements provided that a breach of this obligation would cause irreparable injury to Fish Kiss entitling it to seek injunctive relief without the posting of any bond, with all costs—including attorneys' fees—borne by Wet-It. (2023 Agreement, Para. XI.B, XI.D; 2025 Agreement, Para. XI.B, XI.D.)

44. Both Wet-It Agreements also prohibited Wet-It from utilizing Fish Kiss's vendors or product manufacturers to manufacture or produce any products in competition with Fish Kiss's products—specifically, products bearing artwork of geographic locations or geographic maps—and required Wet-It to treat the identity of Fish Kiss's vendors as strictly confidential. (2023 Agreement, Para. XVI.A–B; 2025 Agreement, Para. XVI.A–B.)

## III. WET-IT'S UNAUTHORIZED INTERFERENCE WITH FISH KISS'S SWIG LICENSING RELATIONSHIP

45. In May 2024, while the 2023 Agreement was in effect, Fish Kiss was presented with a new licensing opportunity when Tracee Mathes ("Mathes"), the president of Swig, contacted Fish Kiss through its customer-service email to express interest in licensing the Fish Kiss Artwork for drinkware products.

46. Mathes's inquiry was received by Justin Davies, who called Mathes directly to discuss a potential Fish Kiss license before even advising Klein of Swig's inquiry. After finishing his conversation with Mathes, Justin Davies then communicated Swig's interest in the Fish Kiss Artwork to Klein by text message, stating: "Fish Kiss stock just doubled in value!" Subsequent communications between the parties suggest that Justin Davies had discussed potential royalty rates with Mathes for the Fish Kiss Artwork.

47. Justin Davies expressly did not have the authority to license, offer to license, or otherwise act as Fish Kiss's agent or representative with respect to the Fish Kiss Artwork. The 2023 Agreement expressly prohibited Wet-It from sublicensing the Fish Kiss Artwork to third parties. (2023 Agreement, Para. I.B.)

48. Klein was frustrated that Justin Davies had called Mathes in the first place and was concerned because she was not privy to the conversation about her own artwork. However, she was interested in growing the Fish Kiss brand through a larger, more established licensee and welcomed the inquiry.

49. After the Swig inquiry was disclosed to Klein, Justin Davies continued to insert himself into business communications between Mathes and Klein, which was particularly concerning to Klein because Swig and Wet-It are direct competitors. Justin Davies communicated with Mathes to such an extent that Mathes was unsure whether she should be dealing with Klein or Justin Davies, who had instructed Mathes that he should be included in licensing discussions. The sensitive discussions included proposed royalty terms, potential timing for a Fish Kiss-branded Swig product rollout, and logistics surrounding pre-booking activity.

50. In the giftware industry, pre-booking refers to soliciting advance wholesale orders for products before they are available for shipment, typically to gauge retailer interest and forecast demand. Pre-booking does not contemplate the exchange of money or products.

51. Following a series of calls and emails, Klein and Mathes agreed to move forward with pre-booking orders for a Spring 2025 release of Fish Kiss-branded Swig drinkware products. The parties agreed that Swig could solicit pre-booking orders at the remaining 2024 trade shows to gauge retailer interest.

52. On or about July 17, 2024, Justin Davies texted Klein photographs of Fish Kiss-branded Swig product samples for soliciting the pre-booking orders and

stated that he had a meeting with Mathes at the then-ongoing Atlanta Market trade show.

53. On December 12, 2024, Fish Kiss and Swig entered into a license agreement granting Swig the exclusive right to use the Fish Kiss Artwork on drinkware products. The pre-orders taken by Swig at the 2024 trade shows reflected strong interest in the Fish Kiss brand, with estimated first-quarter sales of approximately $250,000. Justin Davies did not raise any complaint to Klein about lost sales or rights arising from the Swig arrangement before the expiration of the 2023 Agreement.

54. The 2023 Agreement expired by its terms on January 1, 2025.

## IV. THE TRANSITION, THE 2025 AGREEMENT, AND JUSTIN DAVIES'S POST-EXPIRATION CONDUCT

55. On January 12, 2025, Justin Davies texted Klein regarding the Swig arrangement and his efforts to leverage Swig's contacts. On January 23, 2025, Justin Davies communicated to Klein that Wet-It's sales were down for the January shows and indicated that he intended to contact Swig directly to obtain Swig's confidential customer lists for Wet-It's own use.

56. Despite Klein's objections, Justin Davies continued to pursue Swig in attempts to secure business advantages for Wet-It. Justin Davies consistently claimed that Wet-It was entitled to Swig's customer lists because he had presumptuously and gratuitously served up Fish Kiss's customer list to Swig in his attempt to curry favor for Wet-It's benefit.

57. Upon her discovery of Justin Davies's unauthorized dissemination of Fish Kiss's proprietary and confidential customer lists, Klein expressed her displeasure to Justin Davies, telling him she wouldn't have sent any customer information to Swig without a written agreement in place. She then explained to Justin Davies that Swig was not obligated to reciprocate by providing its customer lists.

58. Upon information and belief, Justin Davies also believed that Wet-It was entitled to Swig's customer lists because Wet-It had allegedly forfeited part of its license by permitting Fish Kiss to move its drinkware business to Swig—a position that Klein rejected as baseless.

59. Klein reminded Justin Davies that the 2023 Agreement had terminated on December 31, 2024, the license had expired, and the parties had no active license agreement in place for Wet-It's ongoing manufacture and distribution of any products, including stainless-steel drinkware. Klein further explained that the earliest Fish Kiss sales transacted through Swig would not occur until March 2025, after the expiration of the 2023 Agreement and any applicable sell-off period, and accordingly, Wet-It had not surrendered any rights to Swig.

60. On March 5, 2025, Klein had a conversation with the Davieses regarding the Fish Kiss business, in which she laid out some concerns. Klein told them that she was not comfortable with their involvement in Fish Kiss's licensing matters and expressed her frustration that Justin Davies had not forwarded Mathes's inquiry directly to her and had instead misrepresented himself as Fish Kiss's agent. Klein

also raised the Davieses' demand that Fish Kiss pay for updates to the Fish Kiss website—an obligation the parties' agreement placed on Wet-It—and her discovery that the Davieses were planning to print another artist's state map artwork on Fish Kiss towels. Klein further explained that she was concerned about the Davieses' involvement interfering with Swig, which had expressed interest in licensing the Fish Kiss Artwork for additional products. Klein was candid that she had not yet decided how to proceed, but wanted to share all of her concerns and to discuss the future of the parties' collaboration before moving forward. Shortly after that conversation, the Davieses informed Klein that they no longer wished to pursue a license for the Fish Kiss Artwork for 2026 and that the parties' three-year business relationship would be coming to an end.

61. Approximately two weeks after that, Justin Davies informed Klein that Wet-It was developing its own state-based map artwork collection to compete with Fish Kiss. That disclosure was significant because, at the time, Wet-It still had full access to the Fish Kiss Artwork, digital art files, customer lists, vendor relationships, and business operations. Klein pointed out to Justin Davies that the parties still needed to have a license agreement in place for the remainder of 2025, as Wet-It's use of the Fish Kiss Artwork was not then under license.

62. Klein was well within her rights to enter into a licensing agreement with Swig, and none of the Swig terms conflicted with Wet-It's rights. However, Klein felt bad for Wet-It and, on April 10, 2025, she advised the Davieses that the total sales from the Swig pre-bookings was $287,902, and to show her goodwill and appreciation

for the parties' five-year relationship, Klein offered to split the royalties from the Swig pre-booking orders—$20,153.15—with Wet-It.

63. On or about April 17, 2025, one week after receiving royalty payment from Swig as promised, Klein sent payment in the amount of $10,076.58 to Wet-It. On April 23, 2025, Wet-It invoiced Klein for $10,076.58, representing its share of those Swig pre-sales—confirming its acceptance of that payment and, by extension, its ratification of the Swig arrangement.

64. On May 12, 2025, Klein sent Wet-It the proposed 2025 Agreement. Having received no response, Klein re-sent the agreement, and on June 3, 2025, Justin Davies executed it.

## V. WET-IT'S PRE-TERMINATION MISCONDUCT

### Overproduction Despite Wind-Down Instructions

65. Sometime in March 2025, Klein advised Justin Davies that he needed to begin winding down production of Fish Kiss inventory, as the license was ending in eight months and Klein could not absorb any excess inventory. Despite Klein's instruction, Justin Davies continued to produce Fish Kiss products.

66. In October 2025—two months before the expiration of the 2025 Agreement—Klein again instructed Justin Davies to cease production of the Licensed Products, noting that the agreement contained no sell-off period and that neither Klein nor Swig was interested in purchasing remaining inventory.

67. Under the 2025 Agreement, Fish Kiss had the right to purchase remaining inventory at the lowest wholesale price upon termination of the license, or

to direct that it be destroyed or donated—there was no sell-off period whatsoever. (2025 Agreement, Para. V.C–D.) Wet-It's continued production in the face of these explicit instructions, in the final months of the license, compounded the inventory problems that Fish Kiss would face upon termination.

**The Development of the Competing Infringing Artwork**

68. Justin Davies declined Klein's offer to continue licensing the Fish Kiss Artwork for tea towels and dishcloths following the expiration of the 2025 Agreement. Klein told the Davieses that Wet-It was free to develop its own artwork but cautioned that it would need to avoid copyright infringement of the Fish Kiss Artwork.

69. Justin Davies responded that the artwork would be fine as long as it was "10% different" from the Fish Kiss Artwork—a standard that does not exist under copyright law. This assertion concerned Klein even more, and she expressly told Justin Davies that this was not an accurate interpretation of copyright law.

70. Justin Davies informed Klein that Wet-It's state map artwork collection was to be created by Kidd, an artist doing business as "Pippa!" and the sister of Mathilda Davies. In the same conversation, Justin Davies expressed concern that Klein might sue him and sought reassurance that she would not. Justin Davies described Wet-It's planned artwork as entirely distinct from the Fish Kiss Artwork—watercolor in style, less detailed, and topographical in nature, as opposed to the illustrative, icon-driven style of Fish Kiss maps. Those assurances proved false.

71. Throughout 2025, as Wet-It continued to develop its competing artwork while still operating the Fish Kiss business and retaining full access to the Fish Kiss

Artwork, Klein periodically raised her concerns. Each time, Justin Davies sought to reassure her. Those reassurances were false.

**The December 2025 Unauthorized Discounting and "Retiring" Campaign**

72. On December 5, 2025, and without Klein's knowledge, Wet-It sent an email blast to its customers—including Fish Kiss customers—advertising a "Closeout" sale of Fish Kiss Colorado tea towels at $5.00 each, approximately fifty percent (50%) off the normal wholesale price of $10.00. Justin Davies had been expressly and repeatedly told that he could not discount Licensed Products by more than thirty percent (30%) without Fish Kiss's prior written authorization, in direct violation of the pricing restrictions in both Wet-It Agreements. (2023 Agreement, Para. X.D; 2025 Agreement, Para. X.C.)

73. On December 29, 2025, Wet-It sent an email blast to its customers marketing tea towels bearing the Fish Kiss Artwork and announcing, "THE FINAL FISH-KISS!" The email asserted "Fish-Kiss Tea Towels Are Retiring At the End of this Year!" and further stated, "We're…saying goodbye to our beloved Fish-Kiss Tea Towels for good." The email offered remaining inventory at a thirty percent (30%) discount. This false and misleading messaging—representing to Fish Kiss's own customers that the Fish Kiss product line was being permanently retired—directly violated the prohibition on misrepresentations in both Wet-It Agreements. An image of the email is shown below:

From: "Wet-It!"
Subject: 30% OFF Fish-Kiss
Date: December 29, 2025 at 8:04:01AM MST
To: "Sarah Cooper"

Email sent out
December 29, 2025

wet-it!

# 30% OFF

On Fish Fiss Kiss Single
Map Kitchen Towel!

We're wrapping up the year with a splash, and saying goodbye to our beloved Fish-Kiss Tea Towels for good.

USE CODE: TT30

Image

# THE FINAL FISH-KISS!

Fish-Kiss Tea Towels Are Officially Retiring At The End Of This Year. That Means Once They're Gone, There Will Be No Restocks.




Fiss Kiss Single Map Kitchen Towel.

74. Upon information and belief, immediately prior to the expiration of the 2025 Agreement, Wet-It sold a substantial quantity of Fish Kiss products to Fish Kiss's wholesale customers at significant discounts, saturating Fish Kiss's customer base with inventory with the intent of impairing Fish Kiss's future sales and its new business relationship with Swig. Upon information and belief, Wet-It's actions were taken with malice and in retaliation for Klein's decision to transition the Fish Kiss drinkware business to Swig.

75. The 2025 Agreement expired by its terms on January 1, 2026. Upon expiration, all licenses granted to Wet-It under both Wet-It Agreements terminated, and Wet-It lost all authority to reproduce, display, distribute, offer for sale, or sell any products bearing the Fish Kiss Artwork.

76. Upon information and belief, Wet-It took orders for, sold, and shipped tea towels bearing the Fish Kiss Artwork after expiration of the 2025 Agreement and after termination of the license, in violation of Fish Kiss's copyrights.

## VI. THE INFRINGING AND DERIVATIVE ARTWORK

77. Paragraph VI.B of the 2025 Agreement states, "Any derivative works resulting from Licensor's changes to the Licensed Artwork, material or otherwise, are owned exclusively by Licensor."

78. Paragraph XI.D. of the 2025 Agreement states, "Licensee may not modify, change or create derivative works from the Licensed Artwork in any manner except to modify size, color, placement or other commercially required, non-material modifications."

79. On or around January 9, 2026, Klein first saw Wet-It's new state-based map artwork collection, which she immediately recognized as copied from her own works (the "Infringing Artwork"). Klein also learned that Wet-It was displaying, selling, and distributing Swedish dishcloths, tea towels, and related table-top products bearing the Infringing Artwork (the "Infringing Products") at the Atlanta Market trade show beginning January 13, 2026.

80. The Infringing Artwork is substantially similar to the Fish Kiss Artwork because it copies a substantial amount of Fish Kiss's curated selections, locations, arrangements, references, landmarks, icons, and visual treatments across state maps. It was created using the Fish Kiss Artwork as the primary reference and copies specific designs selectively featured and located in the Fish Kiss Artwork. The overlap across dozens of states—involving elements personal to Klein herself—is not the product of independent creation.

81. On January 14, 2026, Fish Kiss, through counsel, sent a demand letter to Wet-It asserting claims for copyright infringement and breach of contract and demanding that Wet-It immediately cease manufacture, display, and distribution of the Infringing Products, cancel orders, segregate inventory, and refrain from use of the Fish Kiss Artwork. A copy of Plaintiff's cease and desist letter is attached as **Exhibit D**.

82. Fish Kiss warned Wet-It that continued sales following notice of infringement could constitute willful copyright infringement and identified substantial similarities between the parties' works, including identical selections,

arrangements, landmarks, obscure references, and iconography appearing in multiple state maps (collectively, the "Selections"). Fish Kiss noted Wet-It's inclusion of identical Selections in the same locations as those in the Fish Kiss Artwork as evidence strongly suggesting copying, given the obscure and personal nature of some of those elements. As an example, the map of Pennsylvania depicted in the Fish Kiss Artwork includes references to Peeps®, Zippo® lighters, and drive-in theaters—all fairly obscure factoids that also coincidentally appear in the Infringing Artwork in the same positions. Comparisons of the Fish Kiss Artwork and the Infringing Artwork are attached as **Exhibit E**.

83. The creation and sale of artwork substantially similar to or derivative of the Fish Kiss Artwork without Fish Kiss's authorization also violated the express prohibition on Wet-It's creation of derivative works in the 2025 Agreement.

84. Fish Kiss's January 14, 2026 correspondence led to discussions between the parties' counsel. Wet-It claimed that Kidd, described as an "independent artist," had neither seen nor accessed the Fish Kiss Artwork and that she had independently researched and created the designs. Wet-It's purported evidence of independent creation consisted of screenshots of publicly available images of elements already appearing in Fish Kiss maps and was not accompanied by any evidence of independent research or development.

85. Wet-It ultimately revised the Infringing Artwork in an attempt to avoid copyright infringement, scattering the Selections randomly throughout the artwork accompanied by a small geographic outline of the relevant state (the "Derivative

Artwork"). Exemplars of the Derivative Artwork are attached as **Exhibit F**. Although Klein viewed the Derivative Artwork as an improvement over the Infringing Artwork, she maintained her objections because it remained derivative of the Fish Kiss Artwork.

86. The 2025 Agreement expressly prohibited Wet-It from creating any derivative works from the Fish Kiss Artwork and further provided that any derivative works of the Fish Kiss Artwork are owned exclusively by Fish Kiss, regardless of who made the modification.

87. Despite Fish Kiss's continuing objections and while the parties were ostensibly still engaged in settlement negotiations, Justin Davies began selling products bearing the Derivative Artwork (the "Derivative Products"). This unilateral action further evidenced Defendants' willful disregard for Fish Kiss's rights.

## VII. THE UNAUTHORIZED ZENTRA SUBLICENSE AND AMAZON DIVERSION

88. Paragraph I.C. of the 2025 Agreement states, "Licensee may not grant sublicenses of any of its rights under this Agreement."

89. Paragraph XII.C of the 2025 Agreement states, "Licensee does not have the right to grant sublicenses of Licensor's trademarks. Any attempt to grant a sublicense will be null and void and shall be considered to constitute willful infringement of Licensor's trademark rights."

90. Paragraph X.D. of the 2025 Agreement states, "Licensee shall not discount the price of the Licensed Products by more than thirty percent (30%) of regular retail price without Licensor's prior written authorization."

91. During the term of the 2025 Agreement, without Fish Kiss's knowledge or authorization, Wet-It entered into a separate arrangement with Zentra (the "Zentra Sublicense"), purporting to grant Zentra the right to market, promote, distribute, and sell products bearing the Fish Kiss Artwork and the FISH KISS mark (the "Unauthorized Products"). Wet-It did not disclose the existence of the Zentra Sublicense to Fish Kiss, in direct breach of its contractual obligations (*inter alia,* 2025 Agreement, Para. II.A.1(xii)–(xiii).

92. The Zentra Sublicense was void and without legal effect from its inception. The 2025 Agreement expressly and absolutely prohibited Wet-It from sublicensing any of its rights to any third party. Any sublicense purportedly granted by Wet-It was *ultra vires*, void, and conferred no authority upon Zentra.

93. In furtherance of this unauthorized arrangement, Wet-It attempted to authorize Zentra as a seller under Fish Kiss's Amazon Brand Registry—without Fish Kiss's knowledge or consent—thereby enabling Zentra to display, market, and sell the Unauthorized Products on Fish Kiss's branded Amazon storefront.

94. As a result, Zentra was selling Unauthorized Products not only through Wet-It's Amazon storefront, but also directly through Fish Kiss's Amazon storefront. Zentra additionally sold Fish Kiss products through its own website at zentrallc.com, using the FISH KISS copyrighted artwork in its product listings while identifying those products solely under the Wet-It trademark—omitting any reference to the FISH KISS Mark.

95. Upon information and belief, Wet-It sold Fish Kiss products to Zentra at significantly discounted prices.

96. Upon information and belief, Wet-It attempted to grant Zentra a license of Fish Kiss's intellectual property.

97. Zentra's unauthorized activities diverted revenue that belonged to Fish Kiss and its current licensee Swig and interfered with Fish Kiss's licensing relationships. Fish Kiss has never authorized Zentra to manufacture, market, or sell any products bearing the Fish Kiss Artwork or the FISH KISS Mark.

98. Fish Kiss learned of Wet-It's unauthorized arrangement with Zentra in or around March 2026. Fish Kiss formally notified Wet-It of this additional *ultra vires* breach in its March 24, 2026 correspondence. Fish Kiss promptly revoked Zentra's access to the Fish Kiss Amazon Brand Registry and submitted intellectual property infringement reports to Amazon to remove the unauthorized listings. A representative list of Amazon ASINs and URLs for the Unauthorized Products is attached as **Exhibit G**.

99. While investigating the extent of Zentra's use and exploitation of Fish Kiss's intellectual property, Fish Kiss discovered that Wet-It was prominently displaying the Fish Kiss Artwork and Licensed Products on its Amazon storefront and using them to market Wet-It's products. Attached as **Exhibit H** are several screenshots documenting Wet-It's continued use and display of the Fish Kiss Artwork on its Amazon storefront—one of which is dated August 18, 2026, more than eight

months after the termination of the 2025 Agreement and mere days before the filing of this Complaint.

100. On April 17, 2026, Fish Kiss, through counsel, sent formal notice to Zentra of copyright and trademark infringement and demanded that Zentra immediately: (a) cease and desist all display, marketing, promotion, distribution, and sale of the Subject Products; (b) disable all related online listings; (c) provide a complete written accounting of all sales, revenues, and profits; (d) disclose the terms of its arrangement with Wet-It; (e) identify all downstream retailers; and (f) preserve all relevant documents and communications pursuant to the provided litigation hold notice. A copy of the April 17, 2026 demand letter is attached hereto as **Exhibit I**. Zentra has not provided the demanded accounting or confirmed that its infringing activities have ceased.

101. On or about May 9, 2026, approximately three weeks after Zentra received Fish Kiss's April 17, 2026 correspondence, Zentra relisted the Subject Products on Amazon, on Fish Kiss's storefront and Wet-It's storefront.

102. Over a period of several months in 2026, Fish Kiss made multiple written requests to Zentra, Wet-It, and Wet-It's counsel for a copy of the Zentra Sublicense. Neither party has provided information or otherwise acknowledged Fish Kiss's requests. Accordingly, Fish Kiss lacks information about the nature and terms of the Zentra Sublicense and expressly reserves the right to amend its complaint to include any currently unknown and additional legal claims related to the Zentra Sublicense.

## VIII. POST-TERMINATION BREACHES AND MISCONDUCT

**Royalty Deficiencies**

103. Paragraph VIII.B. of both Wet-It Agreements states, "Royalties shall be paid monthly, within thirty (30) days of the last day of the previous month. A certified accounting shall accompany the payment and shall identify the dollar sales amount of each Licensed Product sold during the month."

104. Paragraph VIII.D of both Wet-It Agreements states, "Royalty payments made more than ten (10) days after the due date shall be considered delinquent and will incur a late fee of 1.5% of the balance due per day for each day that payment is not timely made, calculable from the due date. Should Licensee fail to make accurate royalty payments and to compensate Licensor therefor, all costs of collecting past due royalty payments shall be borne by Licensee. Costs shall include all reasonable attorneys' fees incurred by Licensor in collecting past-due amounts and/or otherwise enforcing the royalty payment terms of this Agreement."

105. Paragraph IX.B. of both Wet-It Agreements states, "Each payment of royalties to Licensor shall be accompanied by a written accounting statement detailing the computation of royalties then due and payable to Licensor. Such written statement shall be in reasonably specific detail and be certified as true and accurate by Licensee. Each such statement shall show the item number and description, gross invoice amount billed, any deductible discounts, allowances and returns, and the reportable sales for each Licensed Products."

106. Both agreements required Wet-It to pay Fish Kiss monthly royalties and to submit certified written accounting statements detailing gross invoice amounts billed, deductible discounts, and reportable net sales for each Licensed Product.

107. In the summer of 2025, Justin Davies admitted to Klein that he had neglected to pay Amazon royalties to Fish Kiss for the years 2024 and 2025 and subsequently requested a meeting with Klein to calculate royalties owed by Wet-It to Fish Kiss. Justin Davies required Klein to attend two separate hours-long Zoom meetings and needlessly watch him calculate two years of Amazon royalties. Justin Davies's calculations showed that past-due royalties owed to Fish Kiss by Wet-It totaled over $8,000. Despite the material delay, Klein did not demand that Wet-It pay the contractual late fee at that time.

108. On February 9, 2026, Wet-It deposited a partial royalty payment into Fish Kiss's account without any accompanying royalty statement or identifying information. The payment was assumedly for December 2025 royalties, but Klein noted that it excluded royalties from Etsy and Shopify sales, and Amazon fourth-quarter royalties remained outstanding.

109. Wet-It again failed to provide a certified written accounting statement for the payment as required under both Wet-It Agreements, in violation of the express reporting obligations. Under agreements, royalties more than ten (10) days overdue accrued a late fee of 1.5% of the balance due per day.

**Inventory Mishandling**

110. Paragraph V.B. of the 2025 Agreement states, "Within ten (10) days after termination of this Agreement, Licensee shall provide Licensor with a list of its inventory of all Licensed Products on hand and in process. Within ten (10) days of the expiration or termination of this Agreement, Licensee shall provide Licensor with a written accounting of all remaining inventory of the Licensed Products."

111. Paragraph V.C. of the 2025 Agreement states, "Upon termination of this Agreement, Licensee grants to Licensor the right to purchase the remaining inventory of Licensed Products at the lowest wholesale price."

112. Paragraph V.D. of the 2025 Agreement states, "Licensor shall provide Licensee with written instructions as to whether the remaining inventory of the Licensed Products shall be purchased by Licensor, destroyed, or donated to an appropriate charitable organization, to be approved in writing by Licensor." Under the 2025 Agreement, Fish Kiss had the right to purchase remaining inventory at the lowest wholesale price, or to direct that it be destroyed or donated—and Wet-It was required to seek and obtain Fish Kiss's written instructions before taking any action with respect to remaining inventory. The 2025 Agreement contained no sell-off period.

113. On or about January 30, 2026, Klein was informed by Bring Fulfillment, Fish Kiss's former third-party logistics service ("Bring"), that it had recently received an unannounced shipment of boxes of Fish Kiss-branded tea towels from Amazon's warehouse without notice, storage instructions, or any inventory accounting. When

Bring's CEO called Justin Davies to find out what he wanted done with the inventory, Davies responded, "Talk to Anne [Klein]."

114. Without providing Klein any accounting of remaining inventory, and without seeking or obtaining Klein's written instructions as to their disposition, Wet-It had unilaterally shipped hundreds of unsold Fish Kiss tea towels to Klein's former warehouser without any notice.

115. As a direct consequence, Klein—who had just resumed management of the Fish Kiss business after a three-year post-natal hiatus—was required to drop everything and travel to the warehouse to manage the situation. Klein estimated the inventory to be in the hundreds or thousands of tea towels.

116. On February 17, 2026, and after the inventory issue was raised by Fish Kiss's counsel, Justin Davies sent two images to Klein: (1) a handwritten note dated December 31, 2025, containing numbers allegedly corresponding to the Fish Kiss inventory that Wet-It had on hand, noted by state abbreviation, with no further detail, and (2) a shot of a stack of cardboard boxes assumedly filled with inventory of Fish Kiss products. Klein responded by reminding Justin Davies that she could do nothing with the remaining inventory, as Swig was creating new tea towels, and any sale of the inventory by Fish Kiss would breach its license with Swig. Accordingly, Klein informed Justin Davies that he would have to destroy the remaining inventory.

117. Justin Davies pushed back, complaining that Klein actually wanted him to put $10,820.25 worth of inventory in the dumpster. When Klein noted that the agreement actually required destruction of the inventory (rather than just tossing it

in a dumpster), Justin Davies began antagonizing Klein, mocking her concerns and repeatedly making patronizing comments to third parties, including Bring's CEO, that Klein was being unreasonable in her destruction demands, suggesting she was concerned that "hobos" would dumpster dive for the product inventory.

118. On March 6, 2026, Justin Davies sent an email to Klein wherein he quoted the language of the 2025 Agreement regarding disposition and destruction of inventory and insisted that Fish Kiss purchase the remaining inventory.

119. On March 9, 2026—over three months after termination of the 2025 Agreement—Justin Davies sent Klein a proposal to sell Fish Kiss the remaining inventory for $18,488. The proposal did not identify the total number of units of inventory being offered or the price per unit.

120. Klein responded to Justin Davies's proposal stating, "Justin, I'm confused – earlier you asked for my permission to destroy this inventory so you could write off $10,820.25 of inventory expenses. Is this the same inventory you are proposing [to sell to Fish Kiss] for $18,488?"

121. Justin Davies's proposal purported to offer the remaining inventory at the "lowest wholesale price" as required by the 2025 Agreement. However, Justin Davies had already represented in writing that the same inventory carried a loss value of $10,820.25 for IRS write-off purposes—implying a per-unit cost of approximately $2.29 per unit based on the 4,733 units identified in Justin Davies's own handwritten inventory note.

122. Justin Davies's $18,488 proposal, applied to the same 4,733 units, yields a per-unit price of approximately $3.91—representing a markup of $1.62 per unit, or approximately 71% above Justin Davies's own stated cost basis for the identical inventory he had simultaneously sought permission to discard.

123. Klein noted that the proposed price of $18,488 was materially inconsistent with Justin Davies's own prior valuation of the inventory and could not constitute the "lowest wholesale price" under any reasonable interpretation of that term—particularly for end-of-license, state-specific inventory with no remaining commercial utility to Fish Kiss, which Justin Davies himself had been prepared to destroy days earlier.

124. Klein then addressed Justin Davies's complaint about the inventory's destruction being a huge waste, stating, "I agree – it is a shame there is so much waste. Since the time you advised you would not be moving forward with Fish Kiss in 2026, you had nine months to sell this inventory down. I mentioned several times over the past year that I would not be able to purchase any inventory...I advised back in June of 2025 [that], 'since we are ending our agreement in 2026, it's important you read through the details about getting rid of excess inventory….'"

125. On March 10, 2026, Klein rejected Justin Davies's buy-back proposal. Justin Davies never explained how inventory he had valued at $10,820.25 for IRS write-off purposes—implying a per-unit cost of $2.29—could constitute the contractually required "lowest wholesale price" at his proposed figure of $18,488, or $3.91 per unit, a markup of approximately 71% above his own stated cost basis.

126. On March 24, 2026, Justin Davies contacted the TPL warehouse operator directly and instructed him to hold off on destroying the inventory because Wet-It was "talking with a new attorney." This conduct further violated Wet-It's obligation to comply with Fish Kiss's inventory disposition instructions.

127. To date, Klein has not been informed as to the inventory's current whereabouts, and Wet-It has never provided oral or written confirmation that the inventory has been destroyed.

**Failure to Return Customer and Vendor Lists**

128. Paragraph II.B.2 of the 2025 Agreement states, "Licensor shall provide Licensee with the contact information for Licensor's manufacturer and vendor contacts and customer lists solely for the purpose of Licensee's operation of the Fish Kiss business. Licensee acknowledges that Licensor's manufacturing and vendor contacts and customer lists ("Licensor's Data") is proprietary to Licensor, extremely valuable and comprises confidential information, the disclosure of which would cause irreparable damage to Licensor and the Fish Kiss business. In addition to any other right or remedy it may have at law or equity, Licensor shall be entitled to seek and obtain injunctive relief without the posting of any bond or other security in order to prevent Licensee's use, dissemination or publication of Licensor's Data. Any costs incurred by Licensor in effecting such forfeiture or in obtaining injunctive relief shall be borne by Licensee, including all reasonable attorneys' fees and costs."

129. Paragraph XV.B of the 2025 Agreement states, "Licensee acknowledges the valuable nature of Licensor's vendors and product manufacturers and accordingly

shall not disclose information related to Licensor's vendors and product manufacturers to any third parties without first obtaining Licensor's written consent."

130. Paragraph XV.C. of the 2025 Agreement states, "All information obtained in any manner by either Party to this Agreement expressly deemed by either Party to be confidential, proprietary or otherwise non-public in nature (hereinafter 'Confidential Information') shall be kept strictly confidential and shall not be disclosed in any manner whatsoever, either in whole or in part, without prior written consent of the other Party during the term of this Agreement and for three (3) years following the termination of the Agreement…Confidential Information may include, but is not limited to…customer lists…and vendor lists and contact information. In the event this Agreement is terminated, all Confidential Information retained by either Party shall be kept confidential and destroyed…"

131. Paragraph XVI.B. of the 2025 Agreement states, "Licensee shall not utilize Licensor's vendors or product manufacturers to manufacture or produce any products sold by Licensee that are in competition with Licensor's products, namely, products bearing artwork of geographic locations or geographic maps."

132. Upon termination of the 2025 Agreement, Wet-It refused to provide Fish Kiss's wholesale customer lists to Klein, alleging that she was not entitled to them.

133. Ironically, in late 2024 or early 2025, while attempting to secure Swig's customer lists for Wet-It, Justin Davies emailed Fish Kiss's proprietary customer lists to Swig without Klein's knowledge or consent, and in direct violation of Wet-It's

confidentiality obligations. Justin Davies sent this customer list to Swig before Fish Kiss and Swig had a written agreement. Justin Davies conveniently left Klein off the email thread where he divulged Fish Kiss's confidential information.

134. Justin Davies demonstrated a flagrant double standard: while he barred Klein from accessing her own customer lists post-termination, he had previously shared that same proprietary data with Swig surreptitiously and without authorization to advance Wet-It's self-serving interests.

135. On February 12, 2026, Fish Kiss sent formal written notice to Wet-It regarding its various contract breaches including Wet-It's failure to return Fish Kiss's customer and vendor lists.

136. On February 19, 2026, almost three months after termination and repeated written demands, Wet-It provided Klein with Fish Kiss's alleged customer lists. However, the lists Wet-It provided were old copies of Fish Kiss's B2B and B2C customer lists that Klein originally supplied Justin Davies in 2023 when Wet-It assumed operation of the Fish Kiss business. These customer lists did not include any current Fish Kiss customers acquired during Wet-It's three-years' long management of the business and were comprised of customers who had since unsubscribed or gone out of business, rendering the lists virtually obsolete.

137. Fish Kiss demanded that Wet-It produce the current customer lists, and on March 4, 2026, Justin Davies provided Klein with Fish Kiss's purported B2B customer lists. However, the lists remained materially deficient. While smaller customer accounts contained adequate contact information, the most commercially

significant key accounts—including Rally House, Buc-ee's, and Murdoch's—only listed the businesses' accounts-payable contact information, omitting buyer contact information entirely. Fish Kiss received no information regarding purchase histories for any account on either list.

138. Upon information and belief, the customer lists that Wet-It produced do not include all Fish Kiss customers and customer information.

139. The timing of Wet-It's deficient productions compounded the commercial harm to Fish Kiss. January is the primary wholesale buying season in Fish Kiss's industry, as retail buyers allocate holiday revenue to purchase inventory for periods spanning up to a full year. Trade shows critical to wholesale outreach occur in January for this reason. By producing incomplete and commercially unusable customer lists in late February and early March 2026, Wet-It ensured that Fish Kiss missed the most significant wholesale buying opportunity of the year, causing direct and material harm to Fish Kiss's ability to rebuild its wholesale business.

140. Fish Kiss demanded immediate production of all customer data, including contact information, purchase histories, communication histories, and buying preferences. Wet-It did not comply.

141. Upon information and belief, Wet-It has not deleted Fish Kiss's customers from its customer database. Upon information and belief, Wet-It has used and continues to use Fish Kiss's customer lists for marketing Wet-It's products.

142. Fish Kiss's inability to provide current, complete customer lists to Swig has directly impaired its ability to fulfill its obligations under the Swig license and to resume normal business operations.

**Retention and Misuse of Customer and Vendor Lists**

143. On February 27, 2026, Wet-It sent a marketing email to its customer list—which incorporated Fish Kiss's customer list—displaying the Infringing Artwork, the very artwork that started the entire dispute, and the very artwork that Fish Kiss had demanded Wet-It cease using over a month earlier. Fish Kiss characterized this as willful copyright infringement in its March 4, 2026 letter to Wet-It's counsel.

144. In response, Wet-It's counsel characterized the marketing activity as "inadvertent" and stated that Wet-It intended to "purge" contact information for Fish Kiss-only customers from its systems. This statement confirmed that Wet-It had been retaining and actively using Fish Kiss's confidential customer data in the interim, in direct breach of the confidentiality obligations under the Wet-It Agreements.

145. On or about March 19, 2026, Fish Kiss learned that Wet-It had contacted Fish Kiss's platter vendor (hereinafter "Platter Vendor"), a manufacturer whose identity was confidential information expressly protected under both agreements – in an effort to place competing orders.

146. Upon information and belief, Defendant directed its employee, Bethany VanCamp, to contact the Platter Vendor for the purpose of establishing a business account on behalf of Wet-It.

147. The Platter Vendor denied Wet-It's account application because it understood Wet-It to be a competitor of Fish Kiss and therefore it would be improper for it to sell product to Wet-It.

148. Following the Platter Vendor's denial of Wet-It's application, the Davieses instructed Wet-It's employee to demand an explanation and to push back on the Platter Vendor's rejection of Wet-It's application.

149. Upon information and belief, sometime in 2025, Wet-It contacted Fish Kiss's vendor of drinkware (hereinafter, "Drinkware Vendor") and started sampling products for application of Wet-It's Derivative Artwork, in violation of the 2025 Agreement.

150. The Drinkware Vendor understood Wet-It to be a competitor of Fish Kiss and believed Wet-It's conduct to be improper. When Wet-It requested price quotes for drinkware bearing the Derivative Artworks, the Drinkware Vendor raised its prices significantly for Wet-It in an effort to discourage it from ordering product and to avoid doing business with Wet-It.

151. Upon information and belief, Wet-It circumvented the Drinkware Vendor's prohibitive pricing by sourcing the Drinkware Vendor's products through placing orders with a third-party "print-on-demand" fulfillment platform (such as Printify) which provides access to the Drinkware Vendor's products at discounted rates through its aggregated purchasing platform.

152. The precise means by which Wet It discovered this workaround remains unclear to Plaintiff at this time and is subject to further investigation and discovery.

153. This conduct constituted a direct violation of Paragraph XVI of the 2025 Agreement prohibiting Wet-It from utilizing Fish Kiss's vendors to manufacture any competing geographic map or location-based products and required Wet-It to treat the identity of Fish Kiss's vendors as strictly confidential.

154. On March 24, 2026, Fish Kiss sent a comprehensive letter further documenting Wet-It's ongoing violations, including Wet-It's contact with Fish Kiss's platter vendor, Wet-It's continued sale of Derivative Products despite outstanding cease and desist demands, the unauthorized Zentra sublicense, and Wet-It's sale of tea towels at prices below the contractually permitted floor. Fish Kiss noted that Wet-It had complied with only a single prior demand—production of Amazon fourth-quarter royalty information—and was in breach of every other outstanding obligation.

**Wet-It's Faire Misconduct: Trademark Infringement, TFPIA Violations, and False Advertising**

155. During the occurrence of the above-described breaches, Fish Kiss discovered that Wet-It had engaged in a separate and particularly brazen category of misconduct. Despite Fish Kiss's repeated offers to purchase the remaining inventory of blank tea towels bearing the FISH KISS Mark, Davies ignored Klein's communications regarding that inventory for an extended period before finally responding that the towels belonged to Wet-It because he had paid for them.

156. Fish Kiss subsequently learned that Wet-It had taken the leftover blank Fish Kiss tea towels—manufactured specifically for Fish Kiss products using Fish Kiss's proprietary sourcing specifications and supply chain—ripped the fabric tag

bearing the FISH KISS Mark from each towel, printed the Infringing Artwork and/or the Derivative Artwork onto the blank product, and sold the altered goods as its own under the name “Pippa State Collection” (the “Mutilated Products”).

157. Wet-It sold the Mutilated Products to its wholesale customers nationwide, who then retailed the Mutilated Products to their end-customers.

158. After confirming Wet-It’s distribution of the Mutilated Products through its purchase of the product from various retailers, Fish Kiss discovered that Wet-It was also selling tea towel products bearing the Derivative Artwork on Faire, which appeared identical to the Mutilated Products.

159. Not content with appropriating Fish Kiss’s existing inventory, Justin Davies also contacted Fish Kiss’s tea towel manufacturer directly in an effort to independently procure blank product on which to print the Derivative Artwork—attempting to establish his own supply line using the very vendor relationship and sourcing specifications Fish Kiss had developed for its own products.

160. On April 22, 2026, Fish Kiss, through counsel, sent a formal letter to Faire’s Legal Department demanding removal of any Mutilated Products.

161. On April 24, 2026, Fish Kiss ordered tea towels bearing the Derivative Artwork from Faire, an online wholesale platform for home and personal goods, located at https://faire.com.

162. Upon receipt and examination of the tea towels ordered from Faire (the “Faire Tea Towels”), Fish Kiss discovered that they were not the Mutilated Products that Fish Kiss’s counsel had purchased from another Wet-It vendor.

163. However, while there were product labels affixed to the Faire Tea Towels displayed fiber content information ("Composition: 80% polyester 20% polyamide") and a website address ("www.wetcloths.com"), they conspicuously omitted the country of origin—a mandatory disclosure under the Textile Fiber Products Identification Act, 15 U.S.C. §§ 70–70k, and its implementing regulations at 16 C.F.R. Part 303.

164. The label contained no source identifying information connecting the goods to their country of origin. The omission of country-of-origin information is an unlawful act under the TFPIA.

165. Second, Wet-It included the term "fishkiss" in the visible text of the product listings themselves, expressly associating Wet-It's competing products with Fish Kiss, creating confusion among customers on the Faire platform, and diverting customers seeking genuine Fish Kiss products.

166. Third, the listings for the Faire Tea Towels state "Made in United States" in the product details, while the listing description directly above simultaneously read "Towel imported." These representations are facially contradictory, and at least one is materially false.

167. Despite being made aware of its error in making this misrepresentation, Wet-It's Faire Tea Towel listings continue to represent that the product is made in the United States.

168. On May 6, 2026, Fish Kiss sent a second letter to Faire providing formal notice of trademark infringement of the registered FISH KISS mark (U.S. Reg. No.

5,027,160) under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), and false designation of origin under Section 43(a), 15 U.S.C. § 1125(a), and demanding removal of all Wet-It listings that used or referenced the FISH KISS Mark in any form, including in product descriptions, keywords, metadata, or collection names. The letter further demanded removal of listings bearing the false country-of-origin representation. A copy of the May 6, 2026 letter is attached as **Exhibit J**.

169. On May 12, 2026, Faire's Trust & Safety team confirmed that it had removed and disabled access to the infringing listings linked to Wet-It's storefront. The effect was immediate: Klein reported to counsel on May 18, 2026, that her Faire orders had increased following the removal of Wet-It's listings—providing direct evidence that Wet-It's use of "fishkiss" in the product listings and its "Replacing Fish Kiss" messaging had been actively diverting Fish Kiss customers to Wet-It's competing products during the months those listings were live.

170. To date, Wet-It has failed to return Fish Kiss's customer and vendor lists in complete and current form; failed to cease creation, manufacture, importation, display, sale and distribution of the Infringing Products; failed to certify destruction of Fish Kiss's digital art files and confidential data; failed to pay all royalties owed; failed to account for all inventory; and failed to comply with the vast majority of Fish Kiss's outstanding contractual demands. Meanwhile, Wet-It has continued selling products bearing both the Infringing Artwork and the Derivative Artwork, misappropriating Fish Kiss's brand equity and customer relationships, and interfering with Fish Kiss's business. Defendants' conduct, taken as a whole, reflects

a calculated and deliberate campaign to exploit Wet-It's three-year access to the Fish Kiss business—its artwork, its customers, its vendors, and its brand—to transplant that business for themselves, leaving Fish Kiss with the empty shell.

171. When Wet-It assumed management of the Fish Kiss business in 2023, Fish Kiss was generating approximately $900,000 in annual sales revenue—a figure consistent with Fish Kiss's 2021 sales of approximately $1,150,000, and consistent even with its 2022 sales of approximately $750,000, achieved in a year in which Klein gave birth, did not attend any trade shows, and operated the company entirely alone—reflecting the inherent strength and stability of the Fish Kiss business independent of any operator. Wet-It maintained this revenue trajectory during its management, generating approximately $900,000 annually in both 2024 and 2025, reflecting monthly sales of approximately $75,000 to $95,000. As a direct result of Wet-It's systematic dismantling of the Fish Kiss business, Fish Kiss's current monthly sales revenue has fallen to approximately $2,500.

## COUNT I – COPYRIGHT INFRINGEMENT

(Defendants Wet-It, Justin Davies, Mathilda Davies, and Kidd)

172. Fish Kiss repeats and realleges all preceding paragraphs as though fully set forth herein.

173. Klein authored the Fish Kiss Artwork and Fish Kiss is the owner of 46 federally registered copyrights in and to the Fish Kiss Artwork. Fish Kiss, LLC—Fish Kiss's predecessor company—assigned all copyrights to Fish Kiss via written

transfer. Each copyright is valid, enforceable, subsisting, and owned exclusively by Fish Kiss.

174. Defendants Wet-It, Justin Davies, and Mathilda Davies had direct, sustained access to the Fish Kiss Artwork through Wet-It's four-year licensing relationship with Fish Kiss, during which Wet-It and the Davieses received and retained all original Fish Kiss Artwork files and operated the Fish Kiss business using those files on a daily basis.

175. Upon information and belief, Wet-It and the Davieses provided Kidd with the original Fish Kiss Artwork files and instructed her to use them to create the Infringing Artwork, whereby Kidd had direct, sustained access to the Fish Kiss Artwork.

176. The Infringing Artwork created by Kidd at the direction of Wet-It, Justin Davies, and Mathilda Davies is substantially and/or strikingly similar to the Fish Kiss Artwork. The Infringing Artwork reproduces Fish Kiss's original and protected selection and arrangement of state-specific iconography, including obscure, highly specific, and personally meaningful elements that Klein incorporated into each state map following more than two years of original research. The overlap across dozens of states involving elements of this character is not the product of independent creation.

177. Wet-It directly infringed Fish Kiss's copyrights by reproducing the Fish Kiss Artwork and by displaying, distributing, offering for sale, and selling products bearing the Infringing Artwork. Kidd directly infringed Fish Kiss's copyrights by reproducing the Fish Kiss Artwork to create the Infringing Artwork.

178. Justin Davies and Mathilda Davies are likewise liable as direct infringers, having personally participated in, directed, and served as the moving force behind this infringing conduct. The Davieses directed Kidd to create the Infringing Artwork, provided Kidd with the original Fish Kiss Artwork files, and made the executive decisions that caused Wet-It to reproduce, distribute, offer for sale, and sell products bearing the Infringing Artwork. The Davieses further instructed that the competing artwork need only be "10% different" from the Fish Kiss Artwork—an instruction reflecting their knowledge of, and personal direction of, the infringing conduct.

179. Defendants Wet-It, Justin Davies, Mathilda Davies, and Kidd have infringed Fish Kiss's copyrights in the Fish Kiss Artwork by reproducing it and displaying, distributing, offering for sale, and selling products bearing the Infringing Artwork nationwide, at industry trade shows, through retail stores, and through on-line websites and platforms in violation of 17 U.S.C. §§ 106 and 501.

180. Plaintiff is informed and believes and thereon alleges that Defendants Wet-It, Justin Davies, Mathilda Davies, and Kidd have committed copyright infringement with actual or constructive knowledge of Plaintiff's rights such that said acts of copyright infringement were, and continue to be, willful, intentional and malicious.

181. Due to Wet-It's, Justin Davies's, Mathilda Davies's, and Kidd's acts of copyright infringement as alleged herein, these Defendants have obtained direct and indirect profits that they would not otherwise have realized but for their infringement

of the Fish Kiss Artwork. As such, Fish Kiss is entitled to disgorgement of Defendants' profits directly and indirectly attributable to Defendants' infringement of the Fish Kiss Artwork in an amount to be established at trial.

182. As a direct and proximate result of Defendants', and each of their, infringement, Fish Kiss has suffered and continues to suffer substantial damages, including lost sales, lost licensing revenue, diminution in value of the Fish Kiss Artwork, and injury to the Fish Kiss brand and goodwill. Fish Kiss is entitled to recover its actual damages and Defendants' profits under 17 U.S.C. § 504(b), or, alternatively, statutory damages of up to $150,000 per infringed work for willful infringement under 17 U.S.C. § 504(c)(2). Fish Kiss is further entitled to its costs and attorneys' fees pursuant to 17 U.S.C. § 505.

183. Due to Defendants Wet-It's, Justin Davies's, Mathilda Davies's, and Kidd's acts of infringement, Fish Kiss has suffered substantial damages to its business in an amount to be established at trial.

184. Due to Wet-It's, Justin Davies's, Mathilda Davies's, and Kidd's acts of infringement, Fish Kiss has suffered general and special damages in an amount to be established at trial.

**COUNT II – VICARIOUS AND/OR CONTRIBUTORY COPYRIGHT INFRINGEMENT**

(Defendants Justin Davies and Mathilda Davies)

185. Fish Kiss repeats and realleges all preceding paragraphs as though fully set forth herein.

186. This Count is pleaded both independently of and, to the extent necessary, in the alternative to Count I.

187. Through Wet-It's multi-year management of the Fish Kiss business, Justin Davies and Mathilda Davies acquired intimate familiarity with the Fish Kiss Artwork and had full knowledge of the infringing activity alleged herein. Knowing that artwork derived from the Fish Kiss Artwork would infringe Fish Kiss's copyrights, the Davieses directed that the competing artwork need only be "10% different" from the Fish Kiss Artwork. With that knowledge, the Davieses materially contributed to the infringement by directing Kidd to create the Infringing Artwork, providing Kidd with the original Fish Kiss Artwork files to use as a reference, and causing Wet-It to reproduce, distribute, and sell products bearing the Infringing Artwork.

188. Upon information and belief, Defendants Justin Davies and Mathilda Davies knowingly induced, participated in, aided and abetted in, supervised, controlled and profited from the illegal reproduction and subsequent sales of product featuring the Infringing Artwork as alleged hereinabove.

189. Upon information and belief, Justin Davies and Mathilda Davies are vicariously liable for the infringement alleged herein because they had the right and ability to supervise the infringing conduct and because they had a direct financial interest in the infringing conduct.

190. By reason of the Defendants', and each of their, acts of contributory and vicarious infringement as alleged above, Fish Kiss has suffered and will continue to

suffer substantial damages to its business in an amount to be established at trial, as well as additional general and special damages in an amount to be established at trial.

191. Due to Defendants' acts of copyright infringement as alleged herein, Defendants Justin Davies and Mathilda Davies, and each of them, have obtained direct and indirect profits they would not otherwise have realized but for their infringement of the Fish Kiss Artwork. As such, Fish Kiss is entitled to disgorgement of Defendants' profits directly and indirectly attributable to Defendants' infringement of the Fish Kiss Artwork, in an amount to be established at trial.

192. Upon information and belief, Defendants, and each of them, have committed acts of copyright infringement, as alleged above, which were willful, intentional and malicious, which further subjects Defendants, and each of them, to liability for statutory damages under Section 504(c)(2) of the Copyright Act in the sum of up to one hundred fifty thousand dollars ($150,000.00) per infringement. Within the time permitted by law, Plaintiff will make its election between actual damages and statutory damages.

**COUNT III – COPYRIGHT INFRINGEMENT**
**(Post-Termination Unauthorized Sales)**
(Defendants Wet-It and Zentra)

193. Fish Kiss repeats and realleges all preceding paragraphs as though fully set forth herein.

194. Notwithstanding the expiration of its license, Wet-It continued to sell and distribute Unauthorized Products bearing the Fish Kiss Artwork after January

1, 2026, including through Wet-It's own Amazon storefront and through Defendant Zentra, to which Wet-It purported to sublicense the right to sell Fish Kiss products—an authority that Wet-It did not possess.

195. Zentra further caused Fish Kiss products to appear for sale on Fish Kiss's own branded Amazon storefront without authorization, directly diverting revenue that belonged to Fish Kiss.

196. Defendants Wet It and Zentra's post-termination sales of Unauthorized Products constitute copyright infringement in violation of 17 U.S.C. §§ 106 and 501. This infringement was willful: Wet It and Zentra had actual knowledge that the license had expired, actual knowledge of Fish Kiss's repeated objections, and continued to sell despite that knowledge. Zentra is jointly and severally liable as a direct infringer for its unauthorized sale and display of Fish Kiss products and relisting of the Unauthorized Products on Amazon.com after receiving and acknowledging Plaintiff's notice of copyright infringement and after representing that the listings for the Unauthorized Products had been disabled.

197. As a direct and proximate result of Defendants' infringement, Fish Kiss has suffered and continues to suffer substantial damages. Fish Kiss is entitled to recover its actual damages and Defendants' profits under 17 U.S.C. § 504(b), or, alternatively, statutory damages of up to $150,000 per infringed work for willful infringement under 17 U.S.C. § 504(c)(2), and its costs and attorneys' fees pursuant to 17 U.S.C. § 505.

**COUNT IV – LANHAM ACT: REVERSE PASSING OFF AND FALSE DESIGNATION OF ORIGIN 15 U.S.C. § 1125(a)**
(Defendant Wet-It)

198. Fish Kiss repeats and realleges all preceding paragraphs as though fully set forth herein.

199. Wet-It obtained blank tea towels manufactured using Fish Kiss's proprietary sourcing specifications and supply chain. Wet-It printed its own competing artwork on those towels and sold the altered goods as its own product, without disclosing Fish Kiss's identity, specifications, or connection to the goods. By selling goods manufactured using Fish Kiss's supply chain and specifications while affixing only Wet-It's own branding and misrepresenting itself as the source, Wet-It committed reverse passing off.

200. Wet-It's conduct constitutes false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), because it misrepresented Wet-It as the source of goods that were manufactured using Fish Kiss's supply chain, product specifications, and proprietary processes, thereby obscuring Fish Kiss's connection to its own products and causing consumer confusion as to the origin and source of those goods.

201. Wet-It's conduct has caused and is likely to continue causing consumer confusion, mistake, and deception as to the source, origin, and sponsorship of those products. Fish Kiss has suffered injury to its business, reputation, and goodwill as a result. Fish Kiss is entitled to recover Defendants' profits, Fish Kiss's actual damages,

enhanced damages for willful conduct, and attorneys' fees pursuant to 15 U.S.C. § 1117(a).

**COUNT V – LANHAM ACT: TRADEMARK INFRINGEMENT, FALSE ADVERTISING, AND FALSE DESIGNATION OF ORIGIN 15 U.S.C. §§ 1114, 1125(a)**
(Defendants Wet-It and Zentra)

202. Fish Kiss repeats and realleges all preceding paragraphs as though fully set forth herein.

203. Fish Kiss owns the FISH KISS marks (U.S. Reg. Nos. 5,027,160 and 5,122,913) and the goodwill associated therewith. Wet-It's right to use the FISH KISS marks terminated upon expiration of the 2025 Agreement on January 1, 2026. Any attempted sublicense of the FISH KISS marks to Zentra was expressly null and void under both agreements and constituted willful trademark infringement. (2025 Agreement, Para. XII.C.)

204. In commerce, Wet It and Zentra made false and misleading statements of fact concerning Fish Kiss and the FISH KISS marks, including by: (a) marketing products on Faire and/or other online marketplace platforms using the designation "Replacing Fish Kiss," which falsely implied that Fish Kiss had endorsed or authorized the transition to Wet-It's competing products; (b) using "fishkiss" as a keyword search tag on Faire and/or other online marketplace platforms, deliberately causing Wet-It's competing products to appear in consumer searches for Fish Kiss goods; (c) using the FISH KISS mark on Wet-It's Amazon storefront and Zentra's website after the license expired; (d) removing or omitting the FISH KISS marks from goods and online product listings for merchandise that originated with or was

manufactured for Fish Kiss, and substituting Wet-It's own name and branding (including "wetcloths.com") in their place, thereby falsely designating Wet-It as the source or origin of those goods; (e) sending email blasts to Fish Kiss's own customers falsely announcing that Fish Kiss tea towels were "retiring" and that they were "saying goodbye for good;" and (e) advertising products on Faire as "Made in United States" while the same listing stated "Towel imported," constituting materially false commercial representations in violation of Section 43(a)(1)(B), 15 U.S.C. § 1125(a)(1)(B).

205. Wet It and Zentra's false and misleading statements have caused and are likely to continue causing consumer confusion, mistake, and deception, and have deceived or had the capacity to deceive a substantial segment of consumers. Fish Kiss has suffered actual diversion of customers, as evidenced by the immediate increase in Fish Kiss's Faire orders following the removal of Wet-It's listings. Fish Kiss has also suffered damage to its reputation and goodwill. Fish Kiss is entitled to recover Defendants' profits, Fish Kiss's actual damages, enhanced damages, and attorneys' fees pursuant to 15 U.S.C. § 1117(a).

**COUNT VI – BREACH OF CONTRACT**
**(2023 and 2025 Agreements)**
(Defendant Wet-It)

206. Fish Kiss repeats and realleges all preceding paragraphs as though fully set forth herein.

207. The 2023 Agreement and the 2025 Agreement are valid and enforceable contracts between Fish Kiss and Wet-It. Fish Kiss performed all of its obligations

under the Wet-It Agreements. Wet-It materially breached the Agreements in numerous respects, including: (a) directing Kidd to create the Infringing Artwork and Derivative Artwork using the Fish Kiss Artwork as a reference, in direct violation of the prohibition on creating derivative works (2025 Agreement, ¶¶ VI.B, XI.D); (b) purporting to sublicense Fish Kiss's rights to Zentra in direct violation of the non-sublicensable provisions (2025 Agreement, ¶ I.C); (c) failing to immediately destroy all digital images, sketches, derivative works, and production materials for the Fish Kiss Artwork upon expiration and to certify that destruction (2025 Agreement, Para. XI.B); (d) failing to provide Fish Kiss with a complete written inventory accounting within ten days of termination and unilaterally shipping hundreds of unsold tea towels to Fish Kiss's TPL warehouse without authorization or disposition instructions (2025 Agreement, ¶ ¶ V.B–D); (e) failing to timely pay all royalties due and failing to provide certified written accounting statements (2023 Agreement ¶¶ VIII.A-D, IX.B; 2025 Agreement, ¶ ¶ VIII.A–D, IX.B); (f) retaining, using, and failing to return and certify destruction of Fish Kiss's confidential customer and vendor lists (2025 Agreement, ¶¶ II.B.2, XV.B–C); (g) contacting Fish Kiss's platter vendor to manufacture competing geographic map products in violation of the vendor non-compete provisions (2025 Agreement, ¶ XVI); (h) selling Fish Kiss products at discounts exceeding the contractually permitted maximum without prior written authorization (2025 Agreement, ¶ X.C); and (i) making false and misleading statements in connection with the marketing of Licensed Products, including the

December 2025 email blasts falsely announcing the permanent retirement of the Fish Kiss brand (2025 Agreement, ¶¶ X.E).

208. As a direct and proximate result of Wet-It's material breaches, Fish Kiss has suffered and continues to suffer substantial damages, including lost royalties with applicable late fees, lost sales, loss of the Swig relationship and associated revenue, storage and destruction costs for mishandled inventory, and the costs of this litigation. Fish Kiss is entitled to recover all such damages, as well as its attorneys' fees and collection costs as expressly provided under both Agreements.

**COUNT VII – BREACH OF FIDUCIARY DUTY**
(Wet-It, Justin Davies, and Mathilda Davies)

209. Fish Kiss repeats and realleges all preceding paragraphs as though fully set forth herein.

210. Wet-It was not merely a licensee. Klein entrusted Wet-It with full and exclusive operational management of the Fish Kiss business—including all customer relationships, vendor relationships, financial accounts, software platforms, social media, and confidential business information—during a period when Klein was pregnant with twins and unable to operate the business herself. The scope of that delegation went far beyond a conventional licensee role and created a special relationship of trust and confidence giving rise to a fiduciary duty to act in Fish Kiss's best interests. Both Agreements expressly acknowledged that relationship of trust. (2023 Agreement, Para. XII.E; 2025 Agreement, Para. XII.E.)

211. Wet-It, Justin Davies, and Mathilda Davies breached that fiduciary duty by, among other things: using Fish Kiss's own artwork, customer relationships,

vendor relationships, and confidential business information to build a directly competing business; deliberately structuring Fish Kiss's software access in a manner that excluded Klein from her own customer data; using Fish Kiss's position of trust to interfere in and exploit the Swig licensing opportunity for Wet-It's benefit; flooding Fish Kiss's customer base with deeply discounted inventory in the final weeks of the license to impair Fish Kiss's ability to operate after their departure; and retaining Fish Kiss's customer and vendor lists for use in Wet-It's competing business rather than returning and destroying them as required.

212. As a direct and proximate result of Defendants' breach of fiduciary duty, Fish Kiss has suffered substantial damages, including lost sales, impairment of its business relationships, loss of goodwill, and the near-complete destruction of its commercial operations. Fish Kiss is entitled to recover all such damages, including any profits Defendants obtained through their breach, and such other equitable relief as the Court deems appropriate.

**COUNT VIII – UNFAIR AND DECEPTIVE TRADE PRACTICES**
**N.C. Gen. Stat. § 75-1.1**
(All Defendants)

213. Fish Kiss repeats and realleges all preceding paragraphs as though fully set forth herein.

214. North Carolina General Statute Section 75-1.1 prohibits unfair or deceptive acts or practices in or affecting commerce. Defendants are engaged in commerce in North Carolina within the meaning of that statute.

215. Defendants engaged in a pattern of unfair and deceptive acts and practices in commerce, including: (a) sending email blasts to Fish Kiss's own customers falsely representing that the Fish Kiss product line was being permanently retired; (b) marketing competing products as "Replacing Fish Kiss" on Faire to deceive consumers and divert Fish Kiss customers; (c) using "fishkiss" as a keyword search tag to intercept consumers searching for Fish Kiss products; (d) printing competing artwork on towels manufactured for Fish Kiss using Fish Kiss's supply chain and selling them as Wet-It's own product without disclosing Fish Kiss's connection; (e) flooding Fish Kiss's customer base with deeply discounted inventory in the final weeks of the license to impair Fish Kiss's ability to sell into those accounts; (f) falsely advertising products as made in the United States while simultaneously representing them as imported; and (g) disparaging Fish Kiss and Klein to vendors, customers, and industry contacts with the intent of damaging Fish Kiss's business relationships and reputation.

216. Defendants' conduct was deliberate and was undertaken with the intent to cause harm to Fish Kiss. As a direct and proximate result, Fish Kiss has suffered actual damages proximately caused by Defendants' unfair and deceptive conduct. Fish Kiss is entitled to recover treble damages pursuant to N.C. Gen. Stat. § 75-16 and attorneys' fees pursuant to N.C. Gen. Stat. § 75-16.1.

## COUNT IX – MISAPPROPRIATION OF TRADE SECRETS
**N.C. Gen. Stat. § 66-152 et seq.**
(Wet-It)

217. Fish Kiss repeats and realleges all preceding paragraphs as though fully set forth herein.

218. Fish Kiss's customer lists, vendor lists, and related business information constitute trade secrets within the meaning of the North Carolina Trade Secrets Protection Act, N.C. Gen. Stat. § 66-152 et seq. This information—including customer identities, contact information, purchase histories, buying preferences, communication histories, and vendor relationships developed over years of business operations—derives independent economic value from not being generally known or readily ascertainable by others. Fish Kiss took reasonable measures to maintain the secrecy of this information, including by limiting its disclosure to Wet-It solely for the purpose of operating the Fish Kiss business and requiring Wet-It to keep it strictly confidential. Both Agreements expressly recognized this information as "extremely valuable" confidential information whose disclosure would cause irreparable damage. (2023 Agreement, Para. II.B.2; 2025 Agreement, Para. II.B.2.)

219. Wet-It misappropriated Fish Kiss's trade secrets by: retaining Fish Kiss's customer and vendor lists after termination in violation of its confidentiality and destruction obligations; using those lists to market Wet-It's competing products to Fish Kiss's customers; using Fish Kiss's confidential vendor information to contact and solicit Fish Kiss's platter vendor for competing orders; and refusing to return,

and upon information and belief deleting, current customer data from the software platforms Wet-It used to manage the Fish Kiss business.

220. Wet-It's misappropriation was willful and malicious. As a direct and proximate result, Fish Kiss has suffered actual damages, including lost sales, impairment of its business relationships, and inability to resume normal operations. Fish Kiss is entitled to recover its actual damages, Defendants' unjust enrichment, and exemplary damages for willful and malicious misappropriation pursuant to N.C. Gen. Stat. § 66-154, as well as its attorneys' fees.

**COUNT X – TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS AND CONTRACT**
(All Defendants)

221. Fish Kiss repeats and realleges all preceding paragraphs as though fully set forth herein.

222. Fish Kiss had valid and existing business relationships and contracts with third parties, including its license agreement with Swig and its established relationships with wholesale customers, vendors, and prospective licensees—all of which Defendants knew about as a result of their three-year access to the Fish Kiss business.

223. Without justification, Defendants intentionally interfered with those business relationships and contracts by: (a) flooding Fish Kiss's wholesale customer base with deeply discounted Fish Kiss inventory in the final weeks of the license, causing retail accounts including Rally House to inform Swig that they would not need to purchase product for the foreseeable future and directly undermining Swig's

ability to sell into established Fish Kiss accounts; (b) sending email blasts to Fish Kiss customers falsely announcing the permanent retirement of the Fish Kiss brand, causing customer confusion and diverting Fish Kiss's customer relationships to Wet-It; (c) using the "Replacing Fish Kiss" designation and the "fishkiss" search keyword to intercept Fish Kiss customers and redirect them to Wet-It's competing products; (d) contacting Swig's CEO directly and attempting to leverage Swig's customer relationships for Wet-It's benefit; and (e) making disparaging statements about Klein and Fish Kiss to vendors, customers, and industry contacts with the intent of damaging Fish Kiss's business relationships and deterring potential partners from working with Fish Kiss.

224. As a direct and proximate result of Defendants' tortious interference, Fish Kiss has suffered and continues to suffer substantial damages, including impaired sales through Swig, loss of established wholesale accounts, loss of prospective licensee relationships, and damage to its brand and goodwill. Fish Kiss is entitled to recover all such damages, including lost profits and such other relief as the Court deems appropriate.

**COUNT XI – CONVERSION**
(Wet-It)

225. Fish Kiss repeats and realleges all preceding paragraphs as though fully set forth herein.

226. Fish Kiss had a property interest in blank tea towels manufactured using its proprietary specifications and supply chain, as well as an exclusive property

interest in its digital art files, which Wet-It was required to destroy upon termination of the 2025 Agreement and has failed to do.

227. Wet-It converted Fish Kiss's blank tea towels by printing its own competing artwork on them, affixing its own non-compliant labels, and selling them as Wet-It's own product on Faire—exercising dominion and control over those goods in a manner that permanently deprived Fish Kiss of those goods and their commercial value. Wet-It further converted Fish Kiss's digital art files by retaining them after its obligation to destroy them arose and, upon information and belief, continuing to use them as a reference in developing competing artwork, contrary to Fish Kiss's exclusive ownership of and right to control those files.

228. As a direct and proximate result of Wet-It's conversion, Fish Kiss has suffered damages equal to the value of the converted property plus any profits Wet-It derived therefrom. Fish Kiss is entitled to recover its actual damages and such other relief as the Court deems appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Fish Kiss, Inc. respectfully requests that this Court grant the following relief:

A. A permanent injunction enjoining Defendants, their officers, agents, employees, and all persons acting in concert with them, from:

   (i) manufacturing, marketing, distributing, offering for sale, or selling Infringing Products, Derivative Products, Unauthorized Products, and/or Converted Products;

(ii) using the Fish Kiss Artwork or any substantially similar or derivative artwork;

(iii) using the FISH KISS Mark or any confusingly similar mark;

(iv) using "fishkiss" or any similar term as a search keyword on any marketplace platform; (v) making any false or misleading statements referencing Fish Kiss or its product lines; and (vi) contacting Fish Kiss's customers, vendors, or business partners using Fish Kiss's confidential information;

B. An order compelling Defendants to immediately destroy all digital art files, derivative works, and production materials for the Fish Kiss Artwork and the Infringing Artwork in their possession or control, and to provide Fish Kiss with sworn certifications of destruction within ten (10) days;

C. An order compelling Defendants to return all Fish Kiss customer and vendor lists in complete and current form, with full purchase histories, communication histories, and marketing contact information and to destroy any copies of Fish Kiss customer and vendor lists;

D. An accounting of all sales, revenues, and profits attributable to the Infringing Products, Derivative Products, Unauthorized Products, and Converted Products;

E. Actual damages and Defendants' profits under 17 U.S.C. § 504(b);

F. Alternatively, statutory damages up to $150,000 per copyrighted work for willful infringement under 17 U.S.C. § 504(c)(2);

G. Treble damages under N.C. Gen. Stat. § 75-16;

H. Exemplary damages for willful and malicious misappropriation of trade secrets under N.C. Gen. Stat. § 66-154;

I. Damages for breach of contract, including lost royalties with late fees, lost sales, storage and destruction costs, impairment of the Swig relationship, and all other damages proximately caused by Defendants' breaches;

J. Attorneys' fees under 17 U.S.C. § 505, 15 U.S.C. § 1117(a), N.C. Gen. Stat. § 75-16.1, and as expressly provided under both agreements;

K. Prejudgment and post-judgment interest at the applicable legal rate;

L. Costs of suit; and

M. Such other and further relief as this Court deems just and proper.

This the 21st day of August, 2026.

/s/ Scottie Forbes Lee
Scottie Forbes Lee
N.C. State Bar No. 50833
ELLIS & WINTERS LLP
Post Office Box 2752
Greensboro, North Carolina 27402
Telephone: (336) 217-4085
scottie.lee@elliswinters.com

*Attorney for Plaintiff Fish Kiss, Inc.*