**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**ASHEVILLE DIVISION**
**Civil Action No.: 26-cv-000243-MOC-WCM**

| | |
|---|---|
| **Fish Kiss, Inc.**,<br><br>Plaintiff,<br><br>v.<br><br>**Swedish Treasures, LLC d/b/a Wet-It!**; **Charles Justin Davies**; **Louise Mathilda Davies**; and **Joanna Philippa Kidd**,<br><br>Defendants. | **FIRST AMENDED COMPLAINT**<br><br>Jury Trial Demanded |

Plaintiff Fish Kiss, Inc. ("Fish Kiss" or "Plaintiff"), by and through its undersigned attorneys, hereby prays to this honorable Court for relief based on the following:

## INTRODUCTION

1. Anne Klein ("Klein") is a visual artist and the principal of Fish Kiss, Inc., a company that designs, markets, and sells home décor and textile products featuring an original collection of more than 50 hand-drawn illustrated maps of U.S. states and cities, each incorporating icons reflecting local history, people, landmarks, and cultural features within the geographic form (the "Fish Kiss Artwork"). Fish Kiss is the owner of 46 federally registered copyrights and the registered trademark FISH KISS® for its artwork, brand and products. Fish Kiss also occasionally licenses its artwork to third parties.

2. Defendant Swedish Treasures, LLC d/b/a Wet-It! is a former licensee that unlawfully exploited its temporary control of the Fish Kiss business and Klein's trust to misappropriate its assets, infringe its intellectual property, and divert Fish Kiss's sales and customers to its own competing business. While entrusted to operate the Fish Kiss business under two agreements from 2023 through 2026, Defendants gained access to Fish Kiss's original artwork, customer relationships, vendors, and goodwill. When that relationship ended and Klein resumed control, Defendant did not step aside—it launched a coordinated effort to appropriate the Fish Kiss business for itself.

3. Defendant hired an artist to copy the Fish Kiss Artwork, sold products bearing that infringing artwork, exploited Fish Kiss's confidential customer and vendor lists to build a competing business, misused Fish Kiss's trademarks to market competing goods, falsely publicized that the Fish Kiss product line was retiring and that its own product was "Replacing Fish Kiss," continued to use Fish Kiss's artwork and marks online after its license expired, including on Amazon storefronts used to market Wet-It's products, removed the FISH KISS cloth tags from towels acquired for the licensed product line, printed competing artwork on them, and sold them without required labeling, and falsely advertised those goods as made in the United States.

4. This action seeks to stop that misconduct and hold Defendants accountable for their copyright infringement, trademark infringement, breach of

contract, breach of fiduciary duty, trade secret misappropriation, and unfair competition—all undertaken with deliberation and malicious intent.

## JURISDICTION AND VENUE

5. This action arises under the Copyright Act of 1976, 17 U.S.C. §§ 101 et seq., the Lanham Act, 15 U.S.C. § 1051 et seq., and North Carolina statutory and common law, including N.C. Gen. Stat. § 75-1.1, the North Carolina Trade Secrets Protection Act, N.C. Gen. Stat. § 66-152 et seq., the Textile Fiber Products Identification Act, 15 U.S.C. § 70 et seq., and related state law claims.

6. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1338(a). This Court has supplemental jurisdiction over all state law claims pursuant to 28 U.S.C. § 1367.

7. Personal jurisdiction over Defendants is proper in this District. Defendant Swedish Treasures, LLC was formed and is operating in North Carolina. Defendants Justin and Mathilda Davies (collectively, "Defendants Davies"), the owners of Swedish Treasures, LLC, are individuals domiciled in North Carolina. Defendant Joanna Philippa Kidd is an individual domiciled in Rutherfordton, North Carolina. Each Defendant has purposefully availed itself of the privilege of conducting business in North Carolina by importing, displaying, distributing, and selling products—including the infringing products—in this District and directing commercial activity toward consumers in this District.

8. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and (c) because Defendants are subject to personal jurisdiction in this District and

therefore reside here for venue purposes. Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, including Defendants' creation, licensing, marketing, distribution, offering for sale, and/or sale of infringing products in this District, and the resulting injury to Plaintiff.

## PARTIES

9. Plaintiff Fish Kiss, Inc. ("Fish Kiss") is a corporation organized and existing under the laws of the State of Colorado with its principal place of business in Erie, Colorado 80516.

10. Defendant Swedish Treasures, LLC d/b/a Wet-It! ("Wet-It") is a limited liability company organized and existing under the laws of North Carolina with its principal place of business in Forest City, North Carolina. Wet-It is a former licensee of the Fish Kiss Artwork that managed and operated the Fish Kiss business between 2023 and 2026, and created, manufactured, and distributed infringing products.

11. Defendant Charles Justin Davies ("Justin Davies") is a resident of Rutherford County, North Carolina. Davies is the Chief Operating Officer of Wet-It, makes most executive decisions for the Wet-It business, was chiefly responsible for Wet-It's relationship with Fish Kiss, and oversaw Fish Kiss's operations.

12. Defendant Louise Mathilda Davies ("Mathilda Davies") is a resident of Rutherford County, North Carolina. Mathilda Davies publicly identifies herself as an owner, designer, and Chief Executive Officer of Wet-It and is responsible for design and product development. Mathilda Davies is the sister of Defendant Joanna

Philippa Kidd and, together with Justin Davies, makes executive decisions for the Wet-It business. During the licensing relationship, Mathilda Davies sought Klein's approval on custom work involving Fish Kiss and expressed concerns about the quality of the tumblers. Although Klein dealt mainly with Justin Davies, Mathilda Davies was included in major conversations concerning the licensing relationship.

13. Defendant Joanna Philippa Kidd ("Kidd") is a resident of Rutherford County. Kidd is the artist who created the Infringing Artwork at Wet-It's instruction. Kidd does business as "Pippa!" and is the sister of Defendant Mathilda Davies.

14. Upon information and belief, at all relevant times, each Defendant was the agent, affiliate, officer, director, manager, principal, shareholder, member, alter ego, employee, and/or co-conspirator of each of the other Defendants and was acting within the scope of such relationship.

15. Upon information and belief, Defendants—and each of them—actively participated in, controlled, ratified, or otherwise adopted the infringing and unlawful conduct of the others, with knowledge of the wrongful nature of such conduct and the resulting harm to Plaintiff.

## FACTUAL BACKGROUND

### I. THE FISH KISS ARTWORK AND BUSINESS

16. Anne Klein is a visual artist, Fish Kiss's principal, and the sole individual creator of the Fish Kiss Artwork. During 2014–2018, Klein was the sole employee of Fish Kiss, LLC. Fish Kiss, LLC hired contractors to assist with the company's customer service and business operations. Creating original artwork for

the LLC's products and business was part of her employment duties, and she created the registered works during that period within the scope of that employment and for the purpose of serving the LLC's business. Klein did not hire or use any other person to assist with the business's artistic or creative work. Fish Kiss designs, markets, and sells home décor and textile products featuring an original collection of more than 50 hand-drawn illustrated maps of U.S. states and cities, each incorporating icons reflecting local history, people, landmarks, and cultural features within the geographic form (the "Fish Kiss Artwork"). Fish Kiss licenses the Fish Kiss Artwork to third parties for use on a range of home goods and giftware.

17. Klein started the Fish Kiss business in 2014. Klein spent over two years researching the geography, history, culture, landmarks, local foods, notable people, and obscure references for each state before creating the original Fish Kiss Artwork, dedicating significant time, effort, and resources to that creative portfolio of work. The Fish Kiss Artwork is distinctive and commercially valuable. An exemplar image is shown below:



18. Fish Kiss is the owner of 46 federally registered copyrights for the Fish Kiss Artwork depicting each of the United States except Alaska, North Dakota, South Dakota, and Rhode Island. Fish Kiss, LLC was formed on February 3, 2014, as a Colorado limited liability company under the name "Fish Kiss," Colorado entity number 20141079247, and operated the Fish Kiss business before the formation of Fish Kiss, Inc. Its Articles of Organization provide for management by its members. Klein created the registered works between 2014 and 2018 as the LLC's employee within the scope of her employment. The works were works made for hire, and the LLC was their legal author and initial copyright owner. The registrations identify "Fish Kiss" as the author and copyright claimant and designate the works as works made for hire. As used in those registrations, "Fish Kiss" identifies the LLC, whose name in its contemporaneous Articles of Organization is "Fish Kiss." Klein completed the applications herself, without the assistance of counsel. Fish Kiss, Inc. was separately formed as a Colorado corporation on March 8, 2019, under Colorado entity number 20191210667. Klein undertook the transition from the LLC to the corporation on the advice of her CPA, and the Fish Kiss business otherwise continued unchanged. In connection with the transfer of the Fish Kiss business, Fish Kiss, LLC transferred its operating assets, including the copyrights in the registered works, to Fish Kiss, Inc., effective April 1, 2021. The LLC was voluntarily dissolved effective July 2, 2021. See **Exhibit J**, consisting of the LLC's Articles of Organization, Fish Kiss, Inc.'s Articles of Incorporation, and Colorado business-entity records reflecting the entities' formation and the LLC's dissolution. On August 12, 2026, Klein, acting

as a member of the member-managed LLC and on its behalf to complete its winding up, executed the Confirmatory Copyright Assignment to memorialize and confirm the April 1, 2021 transfer and to convey any remaining copyright assets. The instrument also presently assigns to Fish Kiss, Inc., as of August 12, 2026, any assigned rights that had not effectively transferred on April 1, 2021. The assigned rights expressly include accrued infringement claims and the right to prosecute and recover on those claims in Fish Kiss, Inc.'s own name. Fish Kiss is also the owner of U.S. Trademark Registration No. 5,027,160 for the FISH KISS and Design mark, registered in International Class 24 for "*tea towels*," and U.S. Trademark Registration No. 5,122,913 for the FISH KISS and Design mark, registered in International Class 21 for dinnerware and drinkware, generally. True copies of the registration certificates for Fish Kiss's 46 copyrights, the Confirmatory Copyright Assignment, and the certificates for Fish Kiss's two trademark registrations are attached as **Exhibit A**. All copyright registrations are valid, subsisting, and owned exclusively by Fish Kiss.

## II. THE PARTIES' LICENSE AGREEMENTS

### The 2023 License and Collaboration Agreement

19. In 2022, Klein realized she needed help managing and operating the Fish Kiss business so she could raise her family. Klein had her first child in 2022 and soon thereafter discovered she was pregnant with twins in 2023.

20. Klein sought a trustworthy business manager to run the day-to-day operations of Fish Kiss, including marketing the brand; taking and fulfilling orders; maintaining and nurturing existing customer relationships and establishing new

ones; and managing Fish Kiss's vendors for the creation and manufacturing of Fish Kiss products.

21. Klein was introduced to Justin Davies and Mathilda Davies ("the Davieses") via email by Tory Johnson of Good Morning America in 2019. Tory Johnson expressed interest in featuring the Fish Kiss Artwork on Wet-It's primary product, Swedish dishcloths, for a Good Morning America product showcase. Klein subsequently met the Davieses in person at a tradeshow.

22. When the Davieses expressed interest in collaborating with Fish Kiss beyond the Good Morning America deal, Klein told the Davieses that she was wary of licensing arrangements because of a very negative experience with a previous licensee.

23. In 2021, Klein licensed the Fish Kiss Artwork to Wet-It for use on Swedish dishcloths to be sold through a Good Morning America product feature. In 2022, Justin Davies suggested that Klein license the Fish Kiss Artwork to Wet-It for production of all Fish Kiss products moving forward, considering her intention to raise a family.

24. Despite her trepidation, Fish Kiss accepted Justin Davies's offer and, on May 23, 2023, Fish Kiss and Wet-It entered into a License and Collaboration Agreement (the "2023 Agreement"), a true and correct copy of which is attached hereto as **Exhibit B** and incorporated herein by reference. The 2023 Agreement had an effective date of January 1, 2023, and an expiration date of January 1, 2025.

25. Under the 2023 Agreement, Wet-It received a limited, revocable, non-transferable, and non-sublicensable license to use the Fish Kiss Artwork solely in connection with the manufacture, promotion, sale, and distribution of tea towels, drinkware, plateware, and Swedish dishcloths (the "Licensed Products"). Fish Kiss expressly reserved all rights not expressly granted.

26. In addition to the license, and as a central element of the parties' arrangement, Wet-It was entrusted to assume full day-to-day operational management of the Fish Kiss business on Fish Kiss's behalf. Wet-It assumed responsibility for sourcing, production, order fulfillment, sales, accounting, marketing, growing and nurturing customer relationships, vendor communications and relationships, operating and managing software systems, marketplace platforms, social media, and the Fish Kiss website.

27. This delegation granted Wet-It the broadest operational control and discretionary management of the Fish Kiss business—going far beyond a typical licensee role. Klein provided Wet-It with "the keys to the castle," granting it full access to Fish Kiss's proprietary artwork files, software platforms, customer lists, vendor lists, and sensitive and confidential business information.

28. The parties' relationship at the outset of the 2023 Agreement was cooperative, and Wet-It generally operated the Fish Kiss business in compliance with the parties' contract.

**The 2025 License and Collaboration Agreement**

29. The 2023 Agreement expired by its terms on January 1, 2025. On May 12, 2025, Klein sent Wet-It a proposed successor license agreement (the "2025 Agreement") to govern the parties' ongoing relationship. On June 3, 2025, Justin Davies executed the 2025 Agreement.

30. The 2025 Agreement, a true and correct copy of which is attached hereto as **Exhibit C** and incorporated herein by reference, had an effective date of January 1, 2025, and an expiration date of January 1, 2026, and superseded the 2023 Agreement with respect to its subject matter.

31. Under the 2025 Agreement, Wet-It received a one-year exclusive license to use the Fish Kiss Artwork in connection with the manufacture, sale, promotion, and distribution of tea towels, glass drinkware, ceramic mugs, plastic platters, and Swedish dishcloths, and a non-exclusive license for art prints, posters, art canvases, baby clothing, pillows, and mini multi-use towels.

32. The 2025 Agreement expressly acknowledged Fish Kiss's existing license and pre-booking arrangement with Occasionally Made, LLC d/b/a Swig ("Swig") for tumblers and stainless-steel drinkware, and provided that the exclusivity provisions did not restrict Fish Kiss's right to grant limited pre-production licenses to third parties. (2025 Agreement, Para. I.E.)

**Key Restrictive Provisions Common to Both Agreements**

33. Both the 2023 Agreement and the 2025 Agreement (collectively the "Wet-It Agreements") required Wet-It to pay Fish Kiss monthly royalties of eight

percent (8%) of net sales of sponge cloth products and seven percent (7%) of net sales of all other Licensed Products, within thirty (30) days of the last day of each preceding month, accompanied by a certified written accounting statement showing gross invoice amounts, deductible discounts, and net sales for each Licensed Product. Royalties more than ten (10) days overdue accrued a late fee of 1.5% of the balance due per day, and all collection costs—including reasonable attorneys' fees—were to be borne by Wet-It. (2023 Agreement, Para. VIII.A–D; 2025 Agreement, Para. VIII.A–D.)

34. Both Wet-It Agreements expressly prohibited Wet-It from granting sublicenses of the Fish Kiss Artwork and the FISH KISS mark to any third party. The license granted to Wet-It was non-transferable, non-assignable, and non-sublicensable. Any purported sublicense was null and void. (2023 Agreement, Para. I.B, XII.C; 2025 Agreement, Para. I.C, XII.A–C.)

35. Both Wet-It Agreements prohibited Wet-It from selling Licensed Products to off-price, value, discount, or job lot retailers without Fish Kiss's prior written approval, and from discounting the price of Licensed Products by more than thirty percent (30%) of regular retail price without Fish Kiss's prior written authorization. (2023 Agreement, Para. X.D; 2025 Agreement, Para. X.C.)

36. Both Wet-It Agreements prohibited Wet-It from making any misrepresentations or deceitful statements in connection with the marketing of Licensed Products, and required Wet-It to withdraw any inaccurate statement within five (5) days of notice. (2023 Agreement, Para. X.F; 2025 Agreement, Para. X.E.)

37. Both Wet-It Agreements expressly stated that Fish Kiss's customer and vendor information is "extremely valuable" confidential information, "the disclosure of which would cause irreparable damage" to Fish Kiss, and that such information was provided to Wet-It solely for the purpose of operating the Fish Kiss business. Wet-It was required to keep all confidential information strictly confidential during the term and for three (3) years following termination, and to then destroy it. (2023 Agreement, Para. II.B.2, XV.B–C; 2025 Agreement, Para. II.B.2, XV.B–C.)

38. Both Wet-It Agreements prohibited Wet-It from creating derivative works from the Fish Kiss Artwork in any manner, and instructed that any such works would be owned exclusively by Fish Kiss. The 2025 Agreement further provided that any derivative works resulting from changes to the Licensed Artwork—material or otherwise—are owned exclusively by Fish Kiss. (2023 Agreement, Para. XI.D; 2025 Agreement, Para. VI.B, XI.D.)

39. Both Wet-It Agreements required Wet-It to provide Fish Kiss with a complete written inventory accounting within ten (10) days of termination and granted Fish Kiss a right to purchase remaining inventory at the lowest wholesale price. The purchase right was optional and did not obligate Fish Kiss to acquire Wet-It's inventory. Paragraph V.D of the 2025 Agreement separately addresses purchase, destruction, or donation of remaining Licensed Products, with any charitable organization to be approved by Fish Kiss in writing. (2023 Agreement, Paras. V.B and V.D; 2025 Agreement, Para. V.B–D.)

40. Upon expiration of the 2025 Agreement, Wet-It was required to immediately destroy all digital images, sketches, derivative works, and production materials for the Licensed Artwork and to certify that destruction to Fish Kiss. Both agreements provided that a breach of this obligation would cause irreparable injury to Fish Kiss entitling it to seek injunctive relief without the posting of any bond, with all costs—including attorneys' fees—borne by Wet-It. (2023 Agreement, Para. XI.B, XI.D; 2025 Agreement, Para. XI.B, XI.D.)

41. Both Wet-It Agreements also prohibited Wet-It from utilizing Fish Kiss's vendors or product manufacturers to manufacture or produce any products in competition with Fish Kiss's products—specifically, products bearing artwork of geographic locations or geographic maps—and required Wet-It to treat the identity of Fish Kiss's vendors as strictly confidential. (2023 Agreement, Para. XVI.A–B; 2025 Agreement, Para. XVI.A–B.)

## III. WET-IT'S UNAUTHORIZED INTERFERENCE WITH FISH KISS'S SWIG LICENSING RELATIONSHIP

42. In May 2024, while the 2023 Agreement was in effect, Fish Kiss was presented with a new licensing opportunity when Tracee Mathes ("Mathes"), the president of Swig, contacted Fish Kiss through its customer-service email to express interest in licensing the Fish Kiss Artwork for drinkware products.

43. Mathes's inquiry was received by Justin Davies, who called Mathes directly to discuss a potential Fish Kiss license before even advising Klein of Swig's inquiry. After finishing his conversation with Mathes, Justin Davies then communicated Swig's interest in the Fish Kiss Artwork to Klein by text message,

stating: "Fish Kiss stock just doubled in value!" Subsequent communications between the parties suggest that Justin Davies had discussed potential royalty rates with Mathes for the Fish Kiss Artwork.

44. Justin Davies expressly did not have the authority to license, offer to license, or otherwise act as Fish Kiss's agent or representative with respect to the Fish Kiss Artwork. The 2023 Agreement expressly prohibited Wet-It from sublicensing the Fish Kiss Artwork to third parties. (2023 Agreement, Para. I.B.)

45. Klein was frustrated that Justin Davies had called Mathes in the first place and was concerned because she was not privy to the conversation about her own artwork. However, she was interested in growing the Fish Kiss brand through a larger, more established licensee and welcomed the inquiry.

46. After the Swig inquiry was disclosed to Klein, Justin Davies continued to insert himself into business communications between Mathes and Klein, which was particularly concerning to Klein because Swig and Wet-It are direct competitors. Justin Davies communicated with Mathes to such an extent that Mathes was unsure whether she should be dealing with Klein or Justin Davies, who had instructed Mathes that he should be included in licensing discussions. The sensitive discussions included proposed royalty terms, potential timing for a Fish Kiss-branded Swig product rollout, and logistics surrounding pre-booking activity.

47. In the giftware industry, pre-booking refers to soliciting advance wholesale orders for products before they are available for shipment, typically to

gauge retailer interest and forecast demand. Pre-booking does not contemplate the exchange of money or products.

48. Following a series of calls and emails, Klein and Mathes agreed to move forward with pre-booking orders for a Spring 2025 release of Fish Kiss-branded Swig drinkware products. The parties agreed that Swig could solicit pre-booking orders at the remaining 2024 trade shows to gauge retailer interest.

49. On or about July 17, 2024, Justin Davies texted Klein photographs of Fish Kiss-branded Swig product samples for soliciting the pre-booking orders and stated that he had a meeting with Mathes at the then-ongoing Atlanta Market trade show.

50. On December 12, 2024, Fish Kiss and Swig entered into a license agreement granting Swig the exclusive right to use the Fish Kiss Artwork on drinkware products. The pre-orders taken by Swig at the 2024 trade shows reflected strong interest in the Fish Kiss brand, with estimated first-quarter sales of approximately $250,000. Justin Davies did not raise any complaint to Klein about lost sales or rights arising from the Swig arrangement before the expiration of the 2023 Agreement.

51. The 2023 Agreement expired by its terms on January 1, 2025.

## IV. THE TRANSITION, THE 2025 AGREEMENT, AND JUSTIN DAVIES'S POST-EXPIRATION CONDUCT

52. On January 12, 2025, Justin Davies texted Klein regarding the Swig arrangement and his efforts to leverage Swig's contacts. On January 23, 2025, Justin Davies communicated to Klein that Wet-It's sales were down for the January shows

and indicated that he intended to contact Swig directly to obtain Swig's confidential customer lists for Wet-It's own use.

53. Despite Klein's objections, Justin Davies continued to pursue Swig in attempts to secure business advantages for Wet-It. Justin Davies consistently claimed that Wet-It was entitled to Swig's customer lists because he had presumptuously and gratuitously served up Fish Kiss's customer list to Swig in his attempt to curry favor for Wet-It's benefit.

54. Upon her discovery of Justin Davies's unauthorized dissemination of Fish Kiss's proprietary and confidential customer lists, Klein expressed her displeasure to Justin Davies, telling him she wouldn't have sent any customer information to Swig without a written agreement in place. She then explained to Justin Davies that Swig was not obligated to reciprocate by providing its customer lists.

55. Upon information and belief, Justin Davies also believed that Wet-It was entitled to Swig's customer lists because Wet-It had allegedly forfeited part of its license by permitting Fish Kiss to move its drinkware business to Swig—a position that Klein rejected as baseless.

56. Klein reminded Justin Davies that the 2023 Agreement had terminated on December 31, 2024, the license had expired, and the parties had no active license agreement in place for Wet-It's ongoing manufacture and distribution of any products, including stainless-steel drinkware. Klein further explained that the earliest Fish Kiss sales transacted through Swig would not occur until March 2025,

after the expiration of the 2023 Agreement and any applicable sell-off period, and accordingly, Wet-It had not surrendered any rights to Swig.

57. On March 5, 2025, Klein had a conversation with the Davieses regarding the Fish Kiss business, in which she laid out some concerns. Klein told them that she was not comfortable with their involvement in Fish Kiss's licensing matters and expressed her frustration that Justin Davies had not forwarded Mathes's inquiry directly to her and had instead misrepresented himself as Fish Kiss's agent. Klein also raised the Davieses' demand that Fish Kiss pay for updates to the Fish Kiss website—an obligation the parties' agreement placed on Wet-It—and her discovery that another artist's state map artwork, not Kidd's, had been uploaded to Klein's Dropbox for proposed tea towel production during the license. Justin Davies initially said that the other artwork was intended for Swedish dishcloths; Mathilda Davies corrected him and confirmed that it was also intended for towels. Klein expressly objected to the proposed towel production. Justin Davies said they would have to tell the customer no, and the Davieses assured Klein that they would put an end to that proposed production. Klein further explained that she was concerned about the Davieses' involvement interfering with Swig, which had expressed interest in licensing the Fish Kiss Artwork for additional products. Klein was candid that she had not yet decided how to proceed, but wanted to share all of her concerns and to discuss the future of the parties' collaboration before moving forward. Shortly after that conversation, the Davieses informed Klein that they no longer wished to pursue

a license for the Fish Kiss Artwork for 2026 and that the parties' three-year business relationship would be coming to an end.

58. Approximately two weeks after that, Justin Davies informed Klein that Wet-It was developing its own state-based map artwork collection to compete with Fish Kiss. That disclosure was significant because, at the time, Wet-It still had full access to the Fish Kiss Artwork, digital art files, customer lists, vendor relationships, and business operations. Klein pointed out to Justin Davies that the parties still needed to have a license agreement in place for the remainder of 2025, as Wet-It's use of the Fish Kiss Artwork was not then under license.

59. Klein was well within her rights to enter into a licensing agreement with Swig, and none of the Swig terms conflicted with Wet-It's rights. However, Klein felt bad for Wet-It and, on April 10, 2025, she advised the Davieses that the total sales from the Swig pre-bookings was $287,902, and to show her goodwill and appreciation for the parties' five-year relationship, Klein offered to split the royalties from the Swig pre-booking orders—$20,153.15—with Wet-It.

60. On or about April 17, 2025, one week after receiving royalty payment from Swig as promised, Klein sent payment in the amount of $10,076.58 to Wet-It. On April 23, 2025, Wet-It invoiced Klein for $10,076.58, representing its share of those Swig pre-sales—confirming its acceptance of that payment and, by extension, its ratification of the Swig arrangement.

61. On May 12, 2025, Klein sent Wet-It the proposed 2025 Agreement. Having received no response, Klein re-sent the agreement, and on June 3, 2025, Justin Davies executed it.

## V. WET-IT'S PRE-TERMINATION MISCONDUCT

### Overproduction Despite Wind-Down Instructions

62. Sometime in March 2025, Klein advised Justin Davies to begin winding down production of Licensed Products before the license expired, explaining that she could not absorb excess inventory. Despite Klein's instruction, Justin Davies continued to produce Fish Kiss products.

63. In October 2025, Klein again instructed Justin Davies to cease production of the Licensed Products and stated that neither Klein nor Swig was interested in purchasing the remaining inventory.

64. Under Paragraph V.C of the 2025 Agreement, Fish Kiss had an option, not an obligation, to purchase remaining Licensed Product inventory at the lowest wholesale price upon termination. Wet-It's continued production despite those warnings compounded the inventory-disposition problems that followed expiration of the license.

### The Development of the Competing Infringing Artwork

65. Justin Davies declined Klein's offer to continue licensing the Fish Kiss Artwork for tea towels and dishcloths following the expiration of the 2025 Agreement. Klein told the Davieses that Wet-It was free to develop its own artwork but cautioned that it would need to avoid copyright infringement of the Fish Kiss Artwork.

66. Justin Davies responded that the artwork would be fine as long as it was "10% different" from the Fish Kiss Artwork—a standard that does not exist under copyright law. This assertion concerned Klein even more, and she expressly told Justin Davies that this was not an accurate interpretation of copyright law. Justin Davies also described placing state flags in different locations on the competing maps from their positions in the Fish Kiss Artwork.

67. Justin Davies informed Klein that Wet-It's state map artwork collection was to be created by Kidd, an artist doing business as "Pippa!" and the sister of Mathilda Davies. In the same conversation, Justin Davies expressed concern that Klein might bring suit over the proposed artwork and sought reassurance that she would not. Justin Davies described Wet-It's planned artwork as entirely distinct from the Fish Kiss Artwork—watercolor in style, less detailed, and topographical in nature, as opposed to the illustrative, icon-driven style of Fish Kiss maps. Those assurances proved false.

68. Throughout 2025, as Wet-It continued to develop its competing artwork while still operating the Fish Kiss business and retaining full access to the Fish Kiss Artwork, Klein periodically raised her concerns. Each time, Justin Davies sought to reassure her. Those reassurances were false.

**The December 2025 Unauthorized Discounting and "Retiring" Campaign**

69. On December 5, 2025, and without Klein's knowledge, Wet-It sent an email blast to its customers—including Fish Kiss customers—advertising a "Closeout" sale of Fish Kiss Colorado tea towels at $5.00 each, approximately fifty

percent (50%) off the normal wholesale price of $10.00. Justin Davies had been expressly and repeatedly told that he could not discount Licensed Products by more than thirty percent (30%) without Fish Kiss's prior written authorization, in direct violation of the pricing restrictions in both Wet-It Agreements. (2023 Agreement, Para. X.D; 2025 Agreement, Para. X.C.)

70. On December 29, 2025, Wet-It sent an email blast to its customers marketing tea towels bearing the Fish Kiss Artwork and announcing, "THE FINAL FISH-KISS!" The email asserted "Fish-Kiss Tea Towels Are Retiring At the End of this Year!" and further stated, "We're…saying goodbye to our beloved Fish-Kiss Tea Towels for good." The email offered remaining inventory at a thirty percent (30%) discount. This false and misleading messaging—representing to Fish Kiss's own customers that the Fish Kiss product line was being permanently retired—directly violated the prohibition on misrepresentations in both Wet-It Agreements. An image of the email is shown below:

**From:** "Wet-It!" <orders@wetcloths.com>
**Subject:** 30% OFF Fish-Kiss
**Date:** December 29, 2025 at 8:04:01AM MST
**To:** "Sarah Cooper" <icboulder@gmail.com>

Email sent out December 29, 2025

wet-it!

# 30% OFF

On Fish Fiss Kiss Single Map Kitchen Towel!

We're wrapping up the year with a splash, and saying goodbye to our beloved Fish-Kiss Tea Towels for good.

USE CODE: TT30

Image

# THE FINAL FISH-KISS!

Fish-Kiss Tea Towels Are Officially Retiring At The End Of This Year. That Means Once They're Gone, There Will Be No Restocks.




Fiss Kiss Single Map Kitchen Towel.

71. Upon information and belief, immediately prior to the expiration of the 2025 Agreement, Wet-It sold a substantial quantity of Fish Kiss products to Fish Kiss's wholesale customers at significant discounts, saturating Fish Kiss's customer base with inventory with the intent of impairing Fish Kiss's future sales and its new business relationship with Swig. Upon information and belief, Wet-It's actions were taken with malice and in retaliation for Klein's decision to transition the Fish Kiss drinkware business to Swig.

72. The 2025 Agreement expired by its terms on January 1, 2026. Upon expiration, all licenses granted to Wet-It under both Wet-It Agreements terminated, and Wet-It lost all authority to reproduce, display, distribute, offer for sale, or sell any products bearing the Fish Kiss Artwork.

73. Upon information and belief, Wet-It took orders for, sold, and shipped tea towels bearing the Fish Kiss Artwork after expiration of the 2025 Agreement and after termination of the license, in violation of Fish Kiss's copyrights.

## VI. THE INFRINGING AND DERIVATIVE ARTWORK

74. Paragraph VI.B of the 2025 Agreement states, "Any derivative works resulting from Licensor's changes to the Licensed Artwork, material or otherwise, are owned exclusively by Licensor."

75. Paragraph XI.D. of the 2025 Agreement states, "Licensee may not modify, change or create derivative works from the Licensed Artwork in any manner except to modify size, color, placement or other commercially required, non-material modifications."

76. On or around January 9, 2026, Klein first saw Wet-It's new state-based map artwork collection, which she immediately recognized as copied from her own works (the "Infringing Artwork"). Klein also learned that Wet-It was displaying, selling, and distributing Swedish dishcloths, tea towels, and related table-top products bearing the Infringing Artwork (the "Infringing Products") at the Atlanta Market trade show beginning January 13, 2026.

77. The Infringing Artwork is substantially similar to the Fish Kiss Artwork because it copies a substantial amount of Fish Kiss's curated selections, locations, arrangements, references, landmarks, icons, and visual treatments across state maps. It was created using the Fish Kiss Artwork as the primary reference and copies specific designs selectively featured and located in the Fish Kiss Artwork. The overlap across dozens of states—involving elements personal to Klein herself—is not the product of independent creation.

78. On January 14, 2026, Fish Kiss, through counsel, sent a demand letter to Wet-It asserting claims for copyright infringement and breach of contract and demanding that Wet-It immediately cease manufacture, display, and distribution of the Infringing Products, cancel orders, segregate inventory, and refrain from use of the Fish Kiss Artwork. A copy of Plaintiff's cease and desist letter is attached as **Exhibit D**.

79. Fish Kiss warned Wet-It that continued sales following notice of infringement could constitute willful copyright infringement and identified substantial similarities between the parties' works, including identical selections,

arrangements, landmarks, obscure references, and iconography appearing in multiple state maps (collectively, the "Selections"). Fish Kiss noted Wet-It's inclusion of identical Selections in the same locations as those in the Fish Kiss Artwork as evidence strongly suggesting copying, given the obscure and personal nature of some of those elements. As an example, the map of Pennsylvania depicted in the Fish Kiss Artwork includes references to Peeps®, Zippo® lighters, and drive-in theaters—all fairly obscure factoids that also coincidentally appear in the Infringing Artwork in the same positions. Comparisons of the Fish Kiss Artwork and the Infringing Artwork are attached as **Exhibit E**.

80. The creation and sale of artwork substantially similar to or derivative of the Fish Kiss Artwork without Fish Kiss's authorization also violated the express prohibition on Wet-It's creation of derivative works in the 2025 Agreement.

81. Fish Kiss's January 14, 2026 correspondence led to discussions between the parties' counsel. Wet-It claimed that Kidd, described as an "independent artist," had neither seen nor accessed the Fish Kiss Artwork and that she had independently researched and created the designs. Wet-It's purported evidence of independent creation consisted of screenshots of publicly available images of elements already appearing in Fish Kiss maps and was not accompanied by any evidence of independent research or development.

82. Wet-It ultimately revised the Infringing Artwork in an attempt to avoid copyright infringement, scattering the Selections randomly throughout the artwork accompanied by a small geographic outline of the relevant state (the "Derivative

Artwork"). Exemplars of the Derivative Artwork are attached as **Exhibit F**. Although Klein viewed the Derivative Artwork as an improvement over the Infringing Artwork, she maintained her objections because it remained derivative of the Fish Kiss Artwork.

83. The 2025 Agreement expressly prohibited Wet-It from creating any derivative works from the Fish Kiss Artwork and further provided that any derivative works of the Fish Kiss Artwork are owned exclusively by Fish Kiss, regardless of who made the modification.

84. Despite Fish Kiss's continuing objections and while the parties were ostensibly still engaged in settlement negotiations, Justin Davies began selling products bearing the Derivative Artwork (the "Derivative Products"). This unilateral action further evidenced Defendants' willful disregard for Fish Kiss's rights.

## VII. WET-IT'S CONTINUED ONLINE USE OF FISH KISS ARTWORK AND BRANDING

85. After its license expired on January 1, 2026, Wet-It continued reproducing and publicly displaying the Fish Kiss Artwork and using the FISH KISS Mark on its own Amazon storefront to market Wet-It's products.

86. Wet-It presented images of products bearing the Fish Kiss Artwork as part of its own branded storefront and promotional content, alongside Wet-It branding and promotion of Wet-It's other products. Attached as **Exhibit H** are screenshots documenting Wet-It's continued use and display of the Fish Kiss Artwork on its Amazon storefront.

87. Fish Kiss alleges that Wet-It's continued presentation of the Fish Kiss Artwork and FISH KISS Mark in its own promotional content after the license expired falsely suggested Fish Kiss's continuing affiliation with, sponsorship of, or approval of Wet-It's products. Wet-It's continued uses diverted customers and revenue and harmed Fish Kiss's goodwill and licensing relationships.

88. During the term of the 2025 Agreement, Wet-It arranged for Zentra, LLC, an e-commerce retailer, to purchase and resell finished Fish Kiss products. On August 5, 2025, Justin Davies asked Klein to connect a selling account to Fish Kiss's Amazon Brand Registry under the "Reseller option" so "this seller" could promote and sell Fish Kiss products. His request supplied a seller token but did not name Zentra or otherwise identify the retailer. Klein completed the requested connection with the understanding that she was authorizing a seller to promote and sell Fish Kiss products, without knowing that the seller was Zentra. Justin Davies did not disclose that the requested connection would enable Zentra to sell through Fish Kiss's own branded Amazon storefront and divert sales from Fish Kiss to Zentra.

89. The connection Justin Davies procured enabled Zentra to offer and sell Fish Kiss products across Fish Kiss's own branded Amazon storefront, as well as through listings appearing on Wet-It's Amazon storefront. Fish Kiss alleges that, as a result, sales generated through Fish Kiss's own storefront were diverted to Zentra, which received the resulting sales revenue instead of Fish Kiss. Klein's completion of the requested reseller connection did not reflect informed approval of that diversion. In or around March 2026, Fish Kiss discovered the challenged online listings

associated with Zentra and raised its objections to Wet-It in correspondence dated March 24, 2026. Fish Kiss revoked Zentra's Brand Registry access and submitted intellectual property infringement reports to Amazon seeking removal of the challenged listings. A representative list of the challenged Amazon ASINs and URLs is attached as **Exhibit G**.

## VIII. POST-TERMINATION BREACHES AND MISCONDUCT

### Pricing and Royalty Accounting

90. Paragraph VIII.B. of both Wet-It Agreements states, "Royalties shall be paid monthly, within thirty (30) days of the last day of the previous month. A certified accounting shall accompany the payment and shall identify the dollar sales amount of each Licensed Product sold during the month."

91. Paragraph VIII.D of both Wet-It Agreements states, "Royalty payments made more than ten (10) days after the due date shall be considered delinquent and will incur a late fee of 1.5% of the balance due per day for each day that payment is not timely made, calculable from the due date. Should Licensee fail to make accurate royalty payments and to compensate Licensor therefor, all costs of collecting past due royalty payments shall be borne by Licensee. Costs shall include all reasonable attorneys' fees incurred by Licensor in collecting past-due amounts and/or otherwise enforcing the royalty payment terms of this Agreement."

92. Paragraph IX.B. of both Wet-It Agreements states, "Each payment of royalties to Licensor shall be accompanied by a written accounting statement detailing the computation of royalties then due and payable to Licensor. Such written

statement shall be in reasonably specific detail and be certified as true and accurate by Licensee. Each such statement shall show the item number and description, gross invoice amount billed, any deductible discounts, allowances and returns, and the reportable sales for each Licensed Products."

93. Both agreements required Wet-It to pay Fish Kiss monthly royalties and to submit certified written accounting statements detailing gross invoice amounts billed, deductible discounts, and reportable net sales for each Licensed Product.

94. In the summer of 2025, Justin Davies admitted to Klein that he had neglected to pay Amazon royalties to Fish Kiss for the years 2024 and 2025 and subsequently requested a meeting with Klein to calculate royalties owed by Wet-It to Fish Kiss. Justin Davies required Klein to attend two separate hours-long Zoom meetings and needlessly watch him calculate two years of Amazon royalties. Justin Davies's calculations showed that past-due royalties owed to Fish Kiss by Wet-It totaled over $8,000. Despite the material delay, Klein did not demand that Wet-It pay the contractual late fee at that time.

95. On February 9, 2026, Wet-It deposited a partial royalty payment into Fish Kiss's account without any accompanying royalty statement or identifying information. The payment was assumedly for December 2025 royalties, but Klein noted that it excluded royalties from Etsy and Shopify sales, and Amazon fourth-quarter royalties remained outstanding.

96. Wet-It again failed to provide a certified written accounting statement for the payment as required under both Wet-It Agreements, in violation of the express

reporting obligations. Under the Wet-It Agreements, royalties more than ten (10) days overdue accrued a late fee of 1.5% of the balance due per day.

97. Paragraph X.C. of the 2025 Agreement states, "Licensee shall not discount the price of the Licensed Products by more than thirty percent (30%) of regular retail price without Licensor's prior written authorization."

98. Upon information and belief, during the term of the 2025 Agreement, Wet-It sold Fish Kiss products to Zentra at significantly discounted prices. Those transactions were subject to the pricing restriction in Paragraph X.C. of the 2025 Agreement and to Wet-It's royalty and accounting obligations under the Wet-It Agreements.

99. Over a period of several months in 2026, Fish Kiss requested the agreement and transaction records governing Wet-It's inventory transactions with Zentra, including information concerning inventory purchases relevant to Wet-It's contractual pricing and accounting obligations.

**Inventory Mishandling**

100. Paragraph V.B. of the 2025 Agreement states, "Within ten (10) days after termination of this Agreement, Licensee shall provide Licensor with a list of its inventory of all Licensed Products on hand and in process. Within ten (10) days of the expiration or termination of this Agreement, Licensee shall provide Licensor with a written accounting of all remaining inventory of the Licensed Products." Wet-It did

not provide the required list and written accounting within ten (10) days after the Agreement expired on January 1, 2026.

101. Paragraph V.C. of the 2025 Agreement states, "Upon termination of this Agreement, Licensee grants to Licensor the right to purchase the remaining inventory of Licensed Products at the lowest wholesale price." This provision gave Fish Kiss a purchase option; it did not itself transfer ownership of the inventory or require Fish Kiss to purchase it.

102. Paragraph V.D. of the 2025 Agreement states, "Licensee shall provide Licensor with written instructions as to whether the remaining inventory of the Licensed Products shall be purchased by Licensor, destroyed, or donated to an appropriate charitable organization, to be approved in writing by Licensor." Separately, Paragraph XI.B provides a remedy of injunctive relief to compel surrender of the Licensed Artwork and Licensed Products in the breach-and-cure circumstances described there. That surrender remedy is distinct from the inventory-accounting obligation and purchase option; it does not establish that Fish Kiss previously owned Wet-It's inventory.

103. On or about January 30, 2026, Klein was informed by Bring Fulfillment, Fish Kiss's former third-party logistics service ("Bring"), that it had recently received an unannounced shipment of boxes of Fish Kiss-branded tea towels from Amazon's warehouse without notice, storage instructions, or any inventory accounting. When Bring's CEO called Justin Davies to find out what he wanted done with the inventory, Davies responded, "Talk to Anne [Klein]."

104. Without providing Klein the required inventory accounting or prior notice of the shipment, Wet-It had unilaterally shipped hundreds of unsold Fish Kiss-branded tea towels to Klein's former warehouser. Fish Kiss had not agreed to purchase that inventory.

105. As a direct consequence, Klein—who had just resumed management of the Fish Kiss business after a three-year post-natal hiatus—was required to drop everything and travel to the warehouse to manage the situation. Klein estimated the inventory to be in the hundreds or thousands of tea towels.

106. On February 17, 2026, and after the inventory issue was raised by Fish Kiss's counsel, Justin Davies sent two images to Klein: (1) a handwritten note dated December 31, 2025, containing numbers allegedly corresponding to the Fish Kiss inventory that Wet-It had on hand, noted by state abbreviation, with no further detail, and (2) a shot of a stack of cardboard boxes assumedly filled with inventory of Fish Kiss products. Klein responded by reminding Justin Davies that she could do nothing with the remaining inventory, as Swig was creating new tea towels, and any sale of the inventory by Fish Kiss would breach its license with Swig. Accordingly, Klein informed Justin Davies that he would have to destroy the remaining inventory.

107. Justin Davies pushed back, complaining that Klein actually wanted him to put $10,820.25 worth of inventory in the dumpster. When Klein objected that the inventory should be destroyed rather than merely discarded in a dumpster, Justin Davies began antagonizing Klein, mocking her concerns and repeatedly making patronizing comments to third parties, including Bring's CEO, that Klein was being

unreasonable in her destruction demands, suggesting she was concerned that "hobos" would dumpster dive for the product inventory.

108. On March 6, 2026, Justin Davies sent an email to Klein wherein he quoted the language of the 2025 Agreement regarding disposition and destruction of inventory and insisted that Fish Kiss purchase the remaining inventory.

109. On March 9, 2026, after the January 1, 2026 expiration of the 2025 Agreement and well after the ten-day accounting deadline, Justin Davies sent Klein a proposal to sell Fish Kiss the remaining inventory for $18,488. The proposal did not identify the total number of units being offered or the price per unit.

110. Klein responded to Justin Davies's proposal stating, "Justin, I'm confused – earlier you asked for my permission to destroy this inventory so you could write off $10,820.25 of inventory expenses. Is this the same inventory you are proposing [to sell to Fish Kiss] for $18,488?"

111. Justin Davies's proposal purported to offer the remaining inventory at the "lowest wholesale price." His earlier written statement referred to $10,820.25 in inventory expenses for write-off purposes. The proposal did not explain whether the two figures covered the same inventory or how either figure related to the proposed purchase price.

112. Justin Davies's handwritten inventory note identified 4,733 units, but the later purchase proposal did not reconcile that note with the inventory being offered for $18,488. The note and proposal did not provide a sufficient basis to

determine whether the offered inventory was the same inventory addressed in the earlier write-off discussion.

113. Klein objected to the unexplained difference between the $18,488 purchase proposal and the earlier $10,820.25 write-off figure. Without a reconciled inventory and unit-pricing information, Fish Kiss lacked adequate information to evaluate whether the proposal honored its contractual right to purchase at the lowest wholesale price. Fish Kiss does not equate the write-off figure with that contractual price.

114. Klein then addressed Justin Davies's complaint about the inventory's destruction being a huge waste, stating, "I agree – it is a shame there is so much waste. Since the time you advised you would not be moving forward with Fish Kiss in 2026, you had nine months to sell this inventory down. I mentioned several times over the past year that I would not be able to purchase any inventory...I advised back in June of 2025 [that], 'since we are ending our agreement in 2026, it's important you read through the details about getting rid of excess inventory….'"

115. On March 10, 2026, Klein rejected Justin Davies's purchase proposal. Justin Davies did not reconcile the two stated amounts, confirm whether they concerned the same inventory, or explain how the proposed $18,488 price represented the lowest wholesale price for the inventory offered.

116. On March 24, 2026, despite Klein's objections and request that the remaining inventory be destroyed, Justin Davies contacted the TPL warehouse operator directly and instructed him to hold off on destruction because Wet-It was

"talking with a new attorney." Wet-It still had not provided Fish Kiss with a complete inventory accounting or a clear account of the inventory's intended disposition.

117. To date, Klein has not been informed as to the inventory's current whereabouts, and Wet-It has never provided oral or written confirmation that the inventory has been destroyed.

**Failure to Return Customer and Vendor Lists**

118. Paragraph II.B.2 of the 2025 Agreement states, "Licensor shall provide Licensee with the contact information for Licensor's manufacturer and vendor contacts and customer lists solely for the purpose of Licensee's operation of the Fish Kiss business. Licensee acknowledges that Licensor's manufacturing and vendor contacts and customer lists ("Licensor's Data") is proprietary to Licensor, extremely valuable and comprises confidential information, the disclosure of which would cause irreparable damage to Licensor and the Fish Kiss business. In addition to any other right or remedy it may have at law or equity, Licensor shall be entitled to seek and obtain injunctive relief without the posting of any bond or other security in order to prevent Licensee's use, dissemination or publication of Licensor's Data. Any costs incurred by Licensor in effecting such forfeiture or in obtaining injunctive relief shall be borne by Licensee, including all reasonable attorneys' fees and costs."

119. Paragraph XV.B of the 2025 Agreement states, "Licensee acknowledges the valuable nature of Licensor's vendors and product manufacturers and accordingly shall not disclose information related to Licensor's vendors and product

manufacturers to any third parties without first obtaining Licensor's written consent."

120. Paragraph XV.C. of the 2025 Agreement states, "All information obtained in any manner by either Party to this Agreement expressly deemed by either Party to be confidential, proprietary or otherwise non-public in nature (hereinafter 'Confidential Information') shall be kept strictly confidential and shall not be disclosed in any manner whatsoever, either in whole or in part, without prior written consent of the other Party during the term of this Agreement and for three (3) years following the termination of the Agreement…Confidential Information may include, but is not limited to…customer lists…and vendor lists and contact information. In the event this Agreement is terminated, all Confidential Information retained by either Party shall be kept confidential and destroyed…"

121. Paragraph XVI.B. of the 2025 Agreement states, "Licensee shall not utilize Licensor's vendors or product manufacturers to manufacture or produce any products sold by Licensee that are in competition with Licensor's products, namely, products bearing artwork of geographic locations or geographic maps."

122. Upon termination of the 2025 Agreement, Wet-It refused to provide Fish Kiss's wholesale customer lists to Klein, alleging that she was not entitled to them.

123. Ironically, in late 2024, while attempting to secure Swig's customer lists for Wet-It, Justin Davies emailed Fish Kiss's proprietary customer lists to Swig without Klein's knowledge or consent, and in direct violation of Wet-It's confidentiality obligations. Justin Davies sent this customer list to Swig before Fish

Kiss and Swig had a written agreement. Justin Davies conveniently left Klein off the email thread where he divulged Fish Kiss's confidential information.

124. Justin Davies demonstrated a flagrant double standard: while he barred Klein from accessing her own customer lists post-termination, he had previously shared that same proprietary data with Swig surreptitiously and without authorization to advance Wet-It's self-serving interests.

125. On February 12, 2026, Fish Kiss sent formal written notice to Wet-It regarding its various contract breaches including Wet-It's failure to return Fish Kiss's customer and vendor lists.

126. On February 19, 2026, after termination and following repeated written demands, Wet-It provided Klein with Fish Kiss's alleged customer lists. However, the lists Wet-It provided were old copies of Fish Kiss's B2B and B2C customer lists that Klein originally supplied Justin Davies in 2023 when Wet-It assumed operation of the Fish Kiss business. These customer lists did not include any current Fish Kiss customers acquired during Wet-It's three-year management of the business and were comprised of customers who had since unsubscribed or gone out of business, rendering the lists virtually obsolete.

127. Fish Kiss demanded that Wet-It produce the current customer lists, and on March 4, 2026, Justin Davies provided Klein with Fish Kiss's purported B2B customer lists. However, the lists remained materially deficient. While smaller customer accounts contained adequate contact information, the most commercially significant key accounts—including Rally House, Buc-ee's, and Murdoch's—only

listed the businesses' accounts-payable contact information, omitting buyer contact information entirely. Fish Kiss received no information regarding purchase histories for any account on either list.

128. Upon information and belief, the customer lists that Wet-It produced do not include all Fish Kiss customers and customer information.

129. The timing of Wet-It's deficient productions compounded the commercial harm to Fish Kiss. January is the primary wholesale buying season in Fish Kiss's industry, as retail buyers allocate holiday revenue to purchase inventory for periods spanning up to a full year. Trade shows critical to wholesale outreach occur in January for this reason. By producing incomplete and commercially unusable customer lists in late February and early March 2026, Wet-It ensured that Fish Kiss missed the most significant wholesale buying opportunity of the year, causing direct and material harm to Fish Kiss's ability to rebuild its wholesale business.

130. Fish Kiss demanded immediate production of all customer data, including contact information, purchase histories, communication histories, and buying preferences. Wet-It did not comply.

131. Upon information and belief, Wet-It has not deleted Fish Kiss's customers from its customer database. Upon information and belief, Wet-It has used and continues to use Fish Kiss's customer lists for marketing Wet-It's products.

132. Fish Kiss's inability to provide current, complete customer lists to Swig has directly impaired its ability to fulfill its obligations under the Swig license and to resume normal business operations.

**Retention and Misuse of Customer and Vendor Lists**

133. On February 27, 2026, Wet-It sent a marketing email to its customer list—which incorporated Fish Kiss's customer list—displaying the Infringing Artwork, the very artwork that started the entire dispute, and the very artwork that Fish Kiss had demanded Wet-It cease using over a month earlier. Fish Kiss characterized this as willful copyright infringement in its March 4, 2026 letter to Wet-It's counsel.

134. In response, Wet-It's counsel characterized the marketing activity as "inadvertent" and stated that Wet-It intended to "purge" contact information for Fish Kiss-only customers from its systems. This statement confirmed that Wet-It had been retaining and actively using Fish Kiss's confidential customer data in the interim, in direct breach of the confidentiality obligations under the Wet-It Agreements.

135. On or about March 19, 2026, Fish Kiss learned that Wet-It had contacted Fish Kiss's platter vendor (hereinafter "Platter Vendor"), a manufacturer whose identity was confidential information expressly protected under both agreements – in an effort to place competing orders.

136. Upon information and belief, Defendant directed its employee, Bethany VanCamp, to contact the Platter Vendor for the purpose of establishing a business account on behalf of Wet-It.

137. The Platter Vendor denied Wet-It's account application because it understood Wet-It to be a competitor of Fish Kiss and therefore it would be improper for it to sell product to Wet-It.

138. Following the Platter Vendor's denial of Wet-It's application, the Davieses instructed Wet-It's employee to demand an explanation and to push back on the Platter Vendor's rejection of Wet-It's application.

139. Upon information and belief, sometime in 2025, Wet-It contacted Fish Kiss's vendor of drinkware (hereinafter, "Drinkware Vendor") and started sampling products for application of Wet-It's Derivative Artwork, in violation of the 2025 Agreement.

140. The Drinkware Vendor understood Wet-It to be a competitor of Fish Kiss and believed Wet-It's conduct to be improper. When Wet-It requested price quotes for drinkware bearing the Derivative Artwork, the Drinkware Vendor raised its prices significantly for Wet-It in an effort to discourage it from ordering product and to avoid doing business with Wet-It.

141. Upon information and belief, Wet-It circumvented the Drinkware Vendor's prohibitive pricing by sourcing the Drinkware Vendor's products through placing orders with a third-party "print-on-demand" fulfillment platform (such as Printify) which provides access to the Drinkware Vendor's products at discounted rates through its aggregated purchasing platform.

142. The precise means by which Wet-It discovered this workaround remains unclear to Plaintiff at this time and is subject to further investigation and discovery.

143. This conduct constituted a direct violation of Paragraph XVI of the 2025 Agreement prohibiting Wet-It from utilizing Fish Kiss's vendors to manufacture any

competing geographic map or location-based products and required Wet-It to treat the identity of Fish Kiss's vendors as strictly confidential.

144. On March 24, 2026, Fish Kiss sent a comprehensive letter further documenting Wet-It's ongoing violations, including Wet-It's contact with Fish Kiss's platter vendor, Wet-It's continued sale of Derivative Products despite outstanding cease and desist demands, Wet-It's arrangement with Zentra and the related use of Fish Kiss's artwork and marks online, and Wet-It's sale of tea towels at prices below the contractually permitted floor. Fish Kiss noted that Wet-It had complied with only a single prior demand—production of Amazon fourth-quarter royalty information—and was in breach of every other outstanding obligation.

**Wet-It's Faire Misconduct: Trademark Infringement, TFPIA Violations, and False Advertising**

145. The blank tea towels at issue were newly acquired and carried as Wet-It inventory under the licensing arrangement. The towels were produced for the licensed Fish Kiss product line using Fish Kiss's specifications and vendor and bore affixed cloth tags branded with the FISH KISS Mark. Despite Fish Kiss's repeated offers to purchase the remaining blank tagged towels, Justin Davies did not respond to Klein's communications for an extended period before asserting that the towels belonged to Wet-It because he had paid for them. Fish Kiss seeks relief for Wet-It's breaches of its contractual inventory obligations and its removal of Fish Kiss branding and use of the towels for competing products.

146. Fish Kiss subsequently learned that Wet-It had taken the remaining blank towels acquired for the licensed Fish Kiss product line using Fish Kiss's

proprietary sourcing specifications and supply chain, ripped off the cloth tags bearing the FISH KISS Mark—the only tags affixed to those towels—printed the Infringing Artwork and/or the Derivative Artwork onto the towels, and sold the altered goods under the name "Pippa State Collection" (the "Mutilated Products").

147. Wet-It sold the Mutilated Products to its wholesale customers nationwide, who then retailed the Mutilated Products to their end-customers.

148. After confirming Wet-It's distribution of the Mutilated Products through its purchase of the product from various retailers, Fish Kiss discovered that Wet-It was also selling tea towel products bearing the Derivative Artwork on Faire, which appeared identical to the Mutilated Products.

149. Justin Davies also contacted Fish Kiss's tea towel manufacturer directly in an effort to independently procure blank product on which to print the Derivative Artwork—attempting to establish his own supply line using the very vendor relationship and sourcing specifications Fish Kiss had developed for its own products.

150. On April 22, 2026, Fish Kiss, through counsel, sent a formal letter to Faire's Legal Department demanding removal of any Mutilated Products.

151. On April 24, 2026, Fish Kiss ordered tea towels bearing the Derivative Artwork from Faire, an online wholesale platform for home and personal goods, located at https://faire.com.

152. Upon receipt and examination of the tea towels ordered from Faire (the "Faire Tea Towels"), Fish Kiss discovered that they were not the Mutilated Products that Fish Kiss's counsel had purchased from another Wet-It vendor.

153. However, while there were product labels affixed to the Faire Tea Towels displayed fiber content information ("Composition: 80% polyester 20% polyamide") and a website address ("www.wetcloths.com"), they conspicuously omitted the country of origin—a mandatory disclosure under the Textile Fiber Products Identification Act, 15 U.S.C. §§ 70–70k, and its implementing regulations at 16 C.F.R. Part 303.

154. The label contained no source identifying information connecting the goods to their country of origin. The omission of country-of-origin information is an unlawful act under the TFPIA.

155. Second, Wet-It included the term "fishkiss" in the visible text of the product listings themselves, expressly associating Wet-It's competing products with Fish Kiss, creating confusion among customers on the Faire platform, and diverting customers seeking genuine Fish Kiss products.

156. Third, the listings for the Faire Tea Towels state "Made in United States" in the product details, while the listing description directly above simultaneously read "Towel imported." These representations are facially contradictory, and at least one is materially false.

157. Despite being made aware of its error in making this misrepresentation, Wet-It's Faire Tea Towel listings continue to represent that the product is made in the United States.

158. On May 6, 2026, Fish Kiss sent a second letter to Faire providing formal notice of trademark infringement of the registered FISH KISS mark (U.S. Reg. No.

5,027,160) under Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1), and false designation of origin under Section 43(a), 15 U.S.C. § 1125(a), and demanding removal of all Wet-It listings that used or referenced the FISH KISS Mark in any form, including in product descriptions, keywords, metadata, or collection names. The letter further demanded removal of listings bearing the false country-of-origin representation. A copy of the May 6, 2026 letter is attached as **Exhibit I**.

159. On May 12, 2026, Faire's Trust & Safety team confirmed that it had removed and disabled access to the infringing listings linked to Wet-It's storefront. The effect was immediate: Klein reported to counsel on May 18, 2026, that her Faire orders had increased following the removal of Wet-It's listings—providing direct evidence that Wet-It's use of "fishkiss" in the product listings and its "Replacing Fish Kiss" messaging had been actively diverting Fish Kiss customers to Wet-It's competing products during the months those listings were live.

160. As of November 16, 2026, Rally House's website continued to display, for commercial purposes, state-map artwork that Klein identified as infringing the Fish Kiss Artwork and to offer the "Nebraska Pippa State Icons Towel," style number 2468914, for sale. The listing image bore "Pippa X Wet-it!" branding, and the webpage displayed an "Add To Cart" option. A full webpage printout of the listing, bearing its URL and a November 16, 2026, 8:19 a.m. EST capture stamp, is attached as **Exhibit K**.

161. To date, Wet-It has failed to return Fish Kiss's customer and vendor lists in complete and current form; failed to cease creation, manufacture, importation,

display, sale and distribution of the Infringing Products; failed to certify destruction of Fish Kiss's digital art files and confidential data; failed to pay all royalties owed; failed to account for all inventory; and failed to comply with the vast majority of Fish Kiss's outstanding contractual demands. Meanwhile, Wet-It has continued selling products bearing both the Infringing Artwork and the Derivative Artwork, misappropriating Fish Kiss's brand equity and customer relationships, and interfering with Fish Kiss's business. Defendants' conduct, taken as a whole, reflects a calculated and deliberate campaign to exploit Wet-It's three-year access to the Fish Kiss business—its artwork, its customers, its vendors, and its brand—to transplant that business for themselves, leaving Fish Kiss with the empty shell.

162. When Wet-It assumed management of the Fish Kiss business in 2023, Fish Kiss was generating approximately $900,000 in annual sales revenue—a figure consistent with Fish Kiss's 2021 sales of approximately $1,150,000, and consistent even with its 2022 sales of approximately $750,000, achieved in a year in which Klein gave birth, did not attend any trade shows, and operated the company entirely alone—reflecting the inherent strength and stability of the Fish Kiss business independent of any operator. Wet-It maintained this revenue trajectory during its management, generating approximately $900,000 annually in both 2024 and 2025, reflecting monthly sales of approximately $75,000 to $95,000. As a direct result of Wet-It's systematic dismantling of the Fish Kiss business, Fish Kiss's current monthly sales revenue has fallen to approximately $2,500.

**COUNT I – COPYRIGHT INFRINGEMENT**
(Defendants Wet-It, Justin Davies, Mathilda Davies, and Kidd)

163. Fish Kiss repeats and realleges all preceding paragraphs as though fully set forth herein.

164. Klein is the sole individual creator of the Fish Kiss Artwork. She created the registered works during 2014–2018 as the sole employee of Fish Kiss, LLC, within the scope of her employment and as part of her duties creating artwork for the LLC's business. The LLC was therefore the legal author and initial copyright owner of those works as works made for hire. Fish Kiss owns the 46 registered copyrights identified in Exhibit A and the associated infringement claims through the transfer from Fish Kiss, LLC effective April 1, 2021, as memorialized and confirmed by the August 12, 2026 Confirmatory Copyright Assignment included in Exhibit A. Under that instrument, any assigned rights not effectively transferred on April 1, 2021, were presently assigned to Fish Kiss on August 12, 2026, including accrued infringement claims and the right to prosecute and recover on those claims in Fish Kiss's own name. Each copyright is valid, enforceable, subsisting, and owned exclusively by Fish Kiss.

165. Wet-It received and retained the original Fish Kiss Artwork files during its licensing relationship with Fish Kiss and used those files to operate the Fish Kiss business. Justin Davies oversaw those operations. Mathilda Davies's design and product-development role included seeking Klein's approval on custom work involving Fish Kiss. Through their respective roles, Justin Davies and Mathilda Davies had access to and familiarity with the Fish Kiss Artwork.

166. Upon information and belief, Justin Davies, Mathilda Davies, and Wet-It provided Kidd with the original Fish Kiss Artwork files and instructed her to use them to create the Infringing Artwork, whereby Kidd had direct, sustained access to the Fish Kiss Artwork.

167. The Infringing Artwork created by Kidd for Wet-It is substantially and/or strikingly similar to the Fish Kiss Artwork. The Infringing Artwork reproduces Fish Kiss's original and protected selection and arrangement of state-specific iconography, including obscure, highly specific, and personally meaningful elements that Klein incorporated into each state map following more than two years of original research. The overlap across dozens of states involving elements of this character is not the product of independent creation.

168. Wet-It directly infringed Fish Kiss's copyrights by reproducing the Fish Kiss Artwork and by displaying, distributing, offering for sale, and selling products bearing the Infringing Artwork. Kidd directly infringed Fish Kiss's copyrights by reproducing the Fish Kiss Artwork to create the Infringing Artwork.

169. Justin Davies and Mathilda Davies are likewise liable as direct infringers based on their respective personal participation in and direction of the infringing conduct. Upon information and belief, Justin Davies directed Kidd to create the Infringing Artwork, Wet-It provided Kidd with the original Fish Kiss Artwork files, and Justin Davies and Mathilda Davies, acting in their respective executive and product-development roles, made the decisions that caused Wet-It to reproduce, distribute, offer for sale, and sell products bearing the Infringing Artwork.

Justin Davies told Klein that the competing artwork need only be "10% different" from the Fish Kiss Artwork, reflecting his awareness of the Fish Kiss Artwork in discussing the competing collection.

170. Defendants Wet-It, Justin Davies, Mathilda Davies, and Kidd have infringed Fish Kiss's copyrights in the Fish Kiss Artwork by reproducing it and displaying, distributing, offering for sale, and selling products bearing the Infringing Artwork nationwide, at industry trade shows, through retail stores, and through on-line websites and platforms in violation of 17 U.S.C. §§ 106 and 501.

171. Plaintiff is informed and believes and thereon alleges that Defendants Wet-It, Justin Davies, Mathilda Davies, and Kidd have committed copyright infringement with actual or constructive knowledge of Plaintiff's rights such that said acts of copyright infringement were, and continue to be, willful, intentional and malicious.

172. Due to Wet-It's, Justin Davies's, Mathilda Davies's, and Kidd's acts of copyright infringement as alleged herein, these Defendants have obtained direct and indirect profits that they would not otherwise have realized but for their infringement of the Fish Kiss Artwork. As such, Fish Kiss is entitled to disgorgement of Defendants' profits directly and indirectly attributable to Defendants' infringement of the Fish Kiss Artwork in an amount to be established at trial.

173. As a direct and proximate result of Defendants', and each of their, infringement, Fish Kiss has suffered and continues to suffer substantial damages, including lost sales, lost licensing revenue, diminution in value of the Fish Kiss

Artwork, and injury to the Fish Kiss brand and goodwill. Fish Kiss is entitled to recover its actual damages and Defendants' profits under 17 U.S.C. § 504(b), or, alternatively, statutory damages of up to $150,000 per infringed work for willful infringement under 17 U.S.C. § 504(c)(2). Fish Kiss is further entitled to its costs and attorneys' fees pursuant to 17 U.S.C. § 505.

174. Due to Defendants Wet-It's, Justin Davies's, Mathilda Davies's, and Kidd's acts of infringement, Fish Kiss has suffered substantial damages to its business in an amount to be established at trial.

175. Due to Wet-It's, Justin Davies's, Mathilda Davies's, and Kidd's acts of infringement, Fish Kiss has suffered general and special damages in an amount to be established at trial.

## COUNT II – VICARIOUS AND/OR CONTRIBUTORY COPYRIGHT INFRINGEMENT

(Defendants Justin Davies and Mathilda Davies)

176. Fish Kiss repeats and realleges all preceding paragraphs as though fully set forth herein.

177. This Count is pleaded both independently of and, to the extent necessary, in the alternative to Count I.

178. Through Wet-It's multi-year management of the Fish Kiss business, Justin Davies and Mathilda Davies acquired intimate familiarity with the Fish Kiss Artwork. Justin Davies told Klein that the competing artwork need only be "10% different" from the Fish Kiss Artwork. Mathilda Davies personally participated in the March 5, 2025 discussion in which Klein objected to the proposed use of another

artist's state artwork on tea towels. Upon information and belief, Justin Davies directed Kidd to create the Infringing Artwork, Wet-It provided Kidd with the original Fish Kiss Artwork files to use as a reference, and Justin Davies and Mathilda Davies knowingly contributed to the infringement through their respective roles in causing Wet-It to reproduce, distribute, and sell products bearing the Infringing Artwork.

179. Upon information and belief, Defendants Justin Davies and Mathilda Davies knowingly induced, participated in, aided and abetted in, supervised, controlled and profited from the illegal reproduction and subsequent sales of product featuring the Infringing Artwork as alleged hereinabove.

180. Upon information and belief, Justin Davies and Mathilda Davies are vicariously liable for the infringement alleged herein because they had the right and ability to supervise the infringing conduct and because they had a direct financial interest in the infringing conduct.

181. By reason of the Defendants', and each of their, acts of contributory and vicarious infringement as alleged above, Fish Kiss has suffered and will continue to suffer substantial damages to its business in an amount to be established at trial, as well as additional general and special damages in an amount to be established at trial.

182. Due to Defendants' acts of copyright infringement as alleged herein, Defendants Justin Davies and Mathilda Davies, and each of them, have obtained direct and indirect profits they would not otherwise have realized but for their

infringement of the Fish Kiss Artwork. As such, Fish Kiss is entitled to disgorgement of Defendants' profits directly and indirectly attributable to Defendants' infringement of the Fish Kiss Artwork, in an amount to be established at trial.

183. Upon information and belief, Defendants, and each of them, have committed acts of copyright infringement, as alleged above, which were willful, intentional and malicious, which further subjects Defendants, and each of them, to liability for statutory damages under Section 504(c)(2) of the Copyright Act in the sum of up to one hundred fifty thousand dollars ($150,000.00) per infringement. Within the time permitted by law, Plaintiff will make its election between actual damages and statutory damages.

**COUNT III – COPYRIGHT INFRINGEMENT**
**(Post-Termination Sales and Online Use)**
(Defendant Wet-It)

184. Fish Kiss repeats and realleges all preceding paragraphs as though fully set forth herein.

185. After its license expired on January 1, 2026, Wet-It continued to reproduce and publicly display the Fish Kiss Artwork on Wet-It's own Amazon storefront to market Wet-It's products.

186. Wet-It incorporated images of the Fish Kiss Artwork and Licensed Products into its own branded storefront and promotional content, including the continuing displays documented in Exhibit H.

187. Wet-It's unauthorized post-expiration reproduction and public display of the Fish Kiss Artwork constitute copyright infringement in violation of 17 U.S.C.

§§ 106 and 501. Wet-It's infringement was willful: Wet-It knew its license had expired, knew of Fish Kiss's repeated objections, and nevertheless continued the unauthorized uses alleged above.

188. As a direct and proximate result of Wet-It's infringement, Fish Kiss has suffered and continues to suffer substantial damages. Fish Kiss is entitled to recover its actual damages and Wet-It's profits under 17 U.S.C. § 504(b), or, alternatively, statutory damages of up to $150,000 per infringed work for willful infringement under 17 U.S.C. § 504(c)(2), and its costs and attorneys' fees pursuant to 17 U.S.C. § 505.

## COUNT IV – LANHAM ACT: REVERSE PASSING OFF AND FALSE DESIGNATION OF ORIGIN 15 U.S.C. § 1125(a)

(Defendant Wet-It)

189. Fish Kiss repeats and realleges all preceding paragraphs as though fully set forth herein.

190. Wet-It purchased blank tea towels for the licensed Fish Kiss product line using Fish Kiss's sourcing specifications and supply chain. The towels bore cloth tags with the FISH KISS Mark. Wet-It removed those tags, printed competing artwork on the towels, and sold the altered goods under its own branding without disclosing their prior Fish Kiss branding or Fish Kiss's connection to the licensed product line. By removing the FISH KISS identifiers and presenting the rebranded goods as its own product, Wet-It committed reverse passing off.

191. Wet-It's conduct constitutes false designation of origin in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), because it removed the FISH

KISS identifiers from goods manufactured and tagged for the licensed Fish Kiss product line and substituted its own branding, thereby obscuring Fish Kiss's connection to those goods and causing consumer confusion as to their origin, source, or sponsorship.

192. Wet-It's conduct has caused and is likely to continue causing consumer confusion, mistake, and deception as to the source, origin, and sponsorship of those products. Fish Kiss has suffered injury to its business, reputation, and goodwill as a result. Fish Kiss is entitled to recover Wet-It's profits, Fish Kiss's actual damages, enhanced damages for willful conduct, and attorneys' fees pursuant to 15 U.S.C. § 1117(a).

## COUNT V – LANHAM ACT: TRADEMARK INFRINGEMENT, FALSE ADVERTISING, AND FALSE DESIGNATION OF ORIGIN 15 U.S.C. §§ 1114, 1125(a)

(Defendant Wet-It)

193. Fish Kiss repeats and realleges all preceding paragraphs as though fully set forth herein.

194. Fish Kiss owns the FISH KISS marks (U.S. Reg. Nos. 5,027,160 and 5,122,913) and the goodwill associated therewith. Wet-It's license to use the FISH KISS marks under the 2025 Agreement expired on January 1, 2026. This claim concerns Wet-It's own unauthorized or misleading uses of Fish Kiss's marks, including the post-expiration marketing and other conduct specified below.

195. In commerce, Wet-It made false and misleading statements of fact concerning Fish Kiss and the FISH KISS marks, including by: (a) marketing products on Faire and/or other online marketplace platforms using the designation "Replacing

Fish Kiss," which falsely implied that Fish Kiss had endorsed or authorized the transition to Wet-It's competing products; (b) using "fishkiss" as a keyword search tag on Faire and/or other online marketplace platforms, deliberately causing Wet-It's competing products to appear in consumer searches for Fish Kiss goods; (c) using the FISH KISS mark on Wet-It's Amazon storefront after the license expired to market Wet-It's products; (d) removing or omitting the FISH KISS marks from goods and online product listings for merchandise manufactured and branded for the licensed Fish Kiss product line, and substituting Wet-It's own name and branding (including "wetcloths.com") in their place, thereby falsely designating Wet-It as the source or origin of those goods; (e) sending email blasts to Fish Kiss's own customers falsely announcing that Fish Kiss tea towels were "retiring" and that they were "saying goodbye for good;" and (f) advertising products on Faire as "Made in United States" while the same listing stated "Towel imported," constituting materially false commercial representations in violation of Section 43(a)(1)(B), 15 U.S.C. § 1125(a)(1)(B).

196. Wet-It's false and misleading statements have caused and are likely to continue causing consumer confusion, mistake, and deception, and have deceived or had the capacity to deceive a substantial segment of consumers. Fish Kiss has suffered actual diversion of customers, as evidenced by the immediate increase in Fish Kiss's Faire orders following the removal of Wet-It's listings. Fish Kiss has also suffered damage to its reputation and goodwill. Fish Kiss is entitled to recover Wet-

It's profits, Fish Kiss's actual damages, enhanced damages, and attorneys' fees pursuant to 15 U.S.C. § 1117(a).

**COUNT VI – BREACH OF CONTRACT**
**(2023 and 2025 Agreements)**
(Defendant Wet-It)

197. Fish Kiss repeats and realleges all preceding paragraphs as though fully set forth herein.

198. The 2023 Agreement and the 2025 Agreement are valid and enforceable contracts between Fish Kiss and Wet-It. Fish Kiss performed all of its obligations under the Wet-It Agreements. Wet-It materially breached the Agreements in numerous respects, including: (a) directing Kidd to create the Infringing Artwork and Derivative Artwork using the Fish Kiss Artwork as a reference, in direct violation of the prohibition on creating derivative works (2025 Agreement, ¶¶ VI.B, XI.D); (b) failing to keep Fish Kiss fully and timely informed of the terms and scope of Wet-It's inventory and online-sales arrangement with Zentra, as distinct from the reseller-account connection that Justin Davies requested and Klein completed (2025 Agreement, ¶¶ II.A.1(xii)–(xiii)); (c) failing to immediately destroy all digital images, sketches, derivative works, and production materials for the Fish Kiss Artwork upon expiration and to certify that destruction, instead retaining those files and, upon information and belief, continuing to use them as a reference in developing competing artwork (2025 Agreement, Para. XI.B); (d) failing to timely provide the required inventory list and complete written accounting, frustrating Fish Kiss's purchase option by failing to identify and reconcile the inventory offered and explain the

proposed lowest wholesale price, and unilaterally shipping unsold tea towels to Fish Kiss's former TPL warehouse without prior notice or a clear written statement of their disposition (2025 Agreement, ¶¶ V.B–D); (e) failing to timely pay all royalties due and failing to provide certified written accounting statements (2023 Agreement ¶¶ VIII.A-D, IX.B; 2025 Agreement, ¶¶ VIII.A–D, IX.B); (f) retaining, using, and failing to return and certify destruction of Fish Kiss's confidential customer and vendor lists (2025 Agreement, ¶¶ II.B.2, XV.B–C); (g) contacting Fish Kiss's vendors to manufacture competing geographic map products in violation of the vendor non-compete provisions (2025 Agreement, ¶ XVI); (h) selling Fish Kiss products at discounts exceeding the contractually permitted maximum without prior written authorization (2025 Agreement, ¶ X.C); and (i) making false and misleading statements in connection with the marketing of Licensed Products, including the December 2025 email blasts falsely announcing the permanent retirement of the Fish Kiss brand (2025 Agreement, ¶ X.E).

199. As a direct and proximate result of Wet-It's material breaches, Fish Kiss has suffered and continues to suffer substantial damages, including lost royalties with applicable late fees, lost sales, impairment of the Swig relationship and associated revenue, storage and destruction costs for mishandled inventory, and the costs of this litigation. Fish Kiss is entitled to recover all such damages, as well as its attorneys' fees and collection costs as expressly provided under both Agreements.

## COUNT VII – BREACH OF FIDUCIARY DUTY
(Justin Davies and Wet-It)

200. Fish Kiss repeats and realleges all preceding paragraphs as though fully set forth herein.

201. Wet-It was not merely a licensee. While Klein was pregnant with twins and raising her family, she acted on behalf of Fish Kiss in entrusting Wet-It with day-to-day operational management of the Fish Kiss business. Wet-It undertook that management, and Justin Davies personally performed it: sourcing and production; sales, payment processing, accounting and order fulfillment; customer and vendor relationships; marketing; and operation of Fish Kiss's software systems, marketplace platforms, social media and website. Licensing authority remained with Klein and Fish Kiss. Through his actual management of those operations, Justin Davies obtained control over Fish Kiss's artwork files, business records, customer and vendor information, and operating platforms. Fish Kiss relied on him to manage those operations and safeguard the information and relationships placed under his control. As alleged in ¶¶122–134, the withholding of essential customer information excluded Fish Kiss, through Klein, from its own customer data and impaired its ability to resume normal operations. Justin Davies's fiduciary duty to Fish Kiss arose from his own undertaking and exercise of that operational control and Fish Kiss's resulting dependence on him, not merely from his title as Wet-It's Chief Operating Officer. Wet-It's fiduciary duty to Fish Kiss arose from its undertaking and exercise, through Justin Davies, of the entrusted operational management and Fish Kiss's reliance on that management. Those circumstances went beyond a conventional artwork license

and required Wet-It and Justin Davies to act in Fish Kiss's best interests in managing the entrusted operations and safeguarding its business information and relationships. Both Agreements also expressly acknowledge a "special relationship of trust" in addressing Fish Kiss's reliance on Wet-It's compliance with its quality standards. (2023 Agreement, Para. XII.E; 2025 Agreement, Para. XII.E.) The fiduciary duties alleged here rest on the actual delegation and exercise of operational control and Fish Kiss's resulting reliance and dependence, not merely on the grant of a license or that contractual wording.

202. Wet-It and Justin Davies exploited the operational access and business relationships described above and breached their respective fiduciary duties to Fish Kiss by, among other things: using Fish Kiss's own artwork, customer relationships, vendor relationships, and confidential business information to build a directly competing business; deliberately structuring Fish Kiss's software access in a manner that excluded Fish Kiss, through Klein, from its own customer data; using their position of trust to interfere in and exploit the Swig licensing opportunity for Wet-It's benefit; flooding Fish Kiss's customer base with deeply discounted inventory in the final month of the license to impair Fish Kiss's ability to operate after their departure; and retaining Fish Kiss's customer and vendor lists for use in Wet-It's competing business rather than returning and destroying them as required. As alleged in ¶¶122–134, Justin Davies disclosed Fish Kiss's customer list to Swig without Klein's knowledge or consent, but later barred Klein, acting on Fish Kiss's behalf, from accessing Fish Kiss's customer lists after termination. The subsequent productions

consisted first of outdated lists supplied when Wet-It took over the business in 2023 and then of materially deficient lists that omitted buyer contacts for key accounts and customer purchase histories. Upon information and belief, Wet-It retained and used Fish Kiss's customer data to market its competing products. The information and relationships used in that conduct had been entrusted to Wet-It to operate Fish Kiss's business, not to divert its customers and opportunities to Wet-It's competing business.

203. As a direct and proximate result of Wet-It's and Justin Davies's breaches of their respective fiduciary duties, Fish Kiss has suffered substantial damages, including lost sales, impairment of its business relationships, loss of goodwill, and the near-complete destruction of its commercial operations. Fish Kiss is entitled to recover all such damages, including any profits Wet-It and Justin Davies obtained through those breaches, and such other equitable relief as the Court deems appropriate.

**COUNT VIII – UNFAIR AND DECEPTIVE TRADE PRACTICES**
**N.C. Gen. Stat. § 75-1.1**
(All Defendants)

204. Fish Kiss repeats and realleges all preceding paragraphs as though fully set forth herein.

205. North Carolina General Statute Section 75-1.1 prohibits unfair or deceptive acts or practices in or affecting commerce. Defendants are engaged in commerce in North Carolina within the meaning of that statute.

206. Defendants engaged in a pattern of unfair and deceptive acts and practices in commerce, including: (a) sending email blasts to Fish Kiss's own customers falsely representing that the Fish Kiss product line was being permanently retired; (b) marketing competing products as "Replacing Fish Kiss" on Faire to deceive consumers and divert Fish Kiss customers; (c) using "fishkiss" as a keyword search tag to intercept consumers searching for Fish Kiss products; (d) removing the FISH KISS cloth tags from towels acquired for the licensed Fish Kiss product line, printing competing artwork on them, and selling the rebranded goods without disclosing their prior Fish Kiss branding or Fish Kiss's connection; (e) flooding Fish Kiss's customer base with deeply discounted inventory in the final month of the license to impair Fish Kiss's ability to sell into those accounts; (f) falsely advertising products as made in the United States while simultaneously representing them as imported; and (g) disparaging Fish Kiss and Klein to vendors, customers, and industry contacts with the intent of damaging Fish Kiss's business relationships and reputation.

207. Defendants' conduct was deliberate and was undertaken with the intent to cause harm to Fish Kiss. As a direct and proximate result, Fish Kiss has suffered actual damages proximately caused by Defendants' unfair and deceptive conduct. Fish Kiss is entitled to recover treble damages pursuant to N.C. Gen. Stat. § 75-16 and attorneys' fees pursuant to N.C. Gen. Stat. § 75-16.1.

## COUNT IX – MISAPPROPRIATION OF TRADE SECRETS
## N.C. Gen. Stat. § 66-152 et seq.
(Wet-It)

208. Fish Kiss repeats and realleges all preceding paragraphs as though fully set forth herein.

209. Fish Kiss's customer lists, vendor lists, and related business information constitute trade secrets within the meaning of the North Carolina Trade Secrets Protection Act, N.C. Gen. Stat. § 66-152 et seq. This information—including customer identities, contact information, purchase histories, buying preferences, communication histories, and vendor relationships developed over years of business operations—derives independent economic value from not being generally known or readily ascertainable by others. Fish Kiss took reasonable measures to maintain the secrecy of this information, including by limiting its disclosure to Wet-It solely for the purpose of operating the Fish Kiss business and requiring Wet-It to keep it strictly confidential. Both Agreements expressly recognized this information as "extremely valuable" confidential information whose disclosure would cause irreparable damage. (2023 Agreement, Para. II.B.2; 2025 Agreement, Para. II.B.2.)

210. Wet-It misappropriated Fish Kiss's trade secrets by: retaining Fish Kiss's customer and vendor lists after termination in violation of its confidentiality and destruction obligations; using those lists to market Wet-It's competing products to Fish Kiss's customers; using Fish Kiss's confidential vendor information to contact and solicit Fish Kiss's vendors for competing orders; and refusing to return, and upon

information and belief deleting, current customer data from the software platforms Wet-It used to manage the Fish Kiss business.

211. Wet-It's misappropriation was willful and malicious. As a direct and proximate result, Fish Kiss has suffered actual damages, including lost sales, impairment of its business relationships, and inability to resume normal operations. Fish Kiss is entitled to recover its actual damages, Wet-It's unjust enrichment, and exemplary damages for willful and malicious misappropriation pursuant to N.C. Gen. Stat. § 66-154, as well as its attorneys' fees.

## COUNT X – TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS AND CONTRACT

(All Defendants)

212. Fish Kiss repeats and realleges all preceding paragraphs as though fully set forth herein.

213. Fish Kiss had valid and existing business relationships and contracts with third parties, including its license agreement with Swig and its established relationships with wholesale customers, vendors, and prospective licensees—all of which Defendants knew about as a result of their three-year access to the Fish Kiss business.

214. Without justification, Defendants intentionally interfered with those business relationships and contracts by: (a) flooding Fish Kiss's wholesale customer base with deeply discounted Fish Kiss inventory in the final month of the license, causing retail accounts including Rally House to inform Swig that they would not need to purchase product for the foreseeable future and directly undermining Swig's

ability to sell into established Fish Kiss accounts; (b) sending email blasts to Fish Kiss customers falsely announcing the permanent retirement of the Fish Kiss brand, causing customer confusion and diverting Fish Kiss's customer relationships to Wet-It; (c) using the "Replacing Fish Kiss" designation and the "fishkiss" search keyword to intercept Fish Kiss customers and redirect them to Wet-It's competing products; (d) contacting Swig's CEO directly and attempting to leverage Swig's customer relationships for Wet-It's benefit; and (e) making disparaging statements about Klein and Fish Kiss to vendors, customers, and industry contacts with the intent of damaging Fish Kiss's business relationships and deterring potential partners from working with Fish Kiss.

215. As a direct and proximate result of Defendants' tortious interference, Fish Kiss has suffered and continues to suffer substantial damages, including impaired sales through Swig, loss of established wholesale accounts, loss of prospective licensee relationships, and damage to its brand and goodwill. Fish Kiss is entitled to recover all such damages, including lost profits and such other relief as the Court deems appropriate.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Fish Kiss, Inc. respectfully requests that this Court grant the following relief:

A. A permanent injunction enjoining Defendants, their officers, agents, employees, and all persons acting in concert with them, from:

(i) manufacturing, marketing, distributing, offering for sale, or selling Infringing Products, Derivative Products, products involved in Wet-It's post-expiration infringement alleged in Count III, and/or Mutilated Products;

(ii) using the Fish Kiss Artwork or any substantially similar or derivative artwork;

(iii) using the FISH KISS Mark or any confusingly similar mark;

(iv) using "fishkiss" or any similar term as a search keyword on any marketplace platform;

(v) making any false or misleading statements referencing Fish Kiss or its product lines; and

(vi) contacting Fish Kiss's customers, vendors, or business partners using Fish Kiss's confidential information;

B. An order compelling Defendants to immediately destroy all digital art files, derivative works, and production materials for the Fish Kiss Artwork and the Infringing Artwork in their possession or control, and to provide Fish Kiss with sworn certifications of destruction within ten (10) days, and, alternatively or additionally as appropriate, an order enforcing the surrender remedy for Licensed Artwork and Licensed Products under Paragraph XI.B of the 2025 Agreement, subject to that provision's requirements;

C. An order compelling Defendants to return all Fish Kiss customer and vendor lists in complete and current form, with full purchase histories, communication

histories, and marketing contact information and to destroy any copies of Fish Kiss customer and vendor lists;

D. An accounting of all sales, revenues, and profits attributable to the Infringing Products, Derivative Products, products involved in Wet-It's post-expiration infringement alleged in Count III, and Mutilated Products;

E. Actual damages and Defendants' profits under 17 U.S.C. § 504(b);

F. Alternatively, statutory damages up to $150,000 per copyrighted work for willful infringement under 17 U.S.C. § 504(c)(2);

G. Treble damages under N.C. Gen. Stat. § 75-16;

H. Exemplary damages for willful and malicious misappropriation of trade secrets under N.C. Gen. Stat. § 66-154;

I. Damages for breach of contract, including lost royalties with late fees, lost sales, storage and destruction costs, impairment of the Swig relationship, and all other damages proximately caused by Defendants' breaches;

J. Attorneys' fees under 17 U.S.C. § 505, 15 U.S.C. § 1117(a), N.C. Gen. Stat. § 75-16.1, and as expressly provided under both agreements;

K. Prejudgment and post-judgment interest at the applicable legal rate;

L. Costs of suit; and

M. Such other and further relief as this Court deems just and proper.

This the 16th day of November, 2026.

ELLIS & WINTERS LLP

/s/ Scottie Forbes Lee
Scottie Forbes Lee
N.C. State Bar No. 50833
Post Office Box 2752
Greensboro, North Carolina 27402
Telephone: (336) 217-4085
scottie.lee@elliswinters.com

*Attorney for Plaintiff Fish Kiss, Inc.*